GREENBERG TRAURIG, LLP
Jeff E. Scott (SBN 126308)
scottj@gtlaw.com
1840 Century Park East
Suite 1900
Los Angeles, California 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

GREENBERG TRAURIG, LLP
Roger L. Scott (SBN 247165)
scottro@gtlaw.com
3161 Michelson Drive, Suite 1000
Irvine, California 92612
Telephone: (949) 732-6500
Facsimile: (949) 732-6501

Attorneys for Plaintiff
Whitewater West Industries, Ltd.

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WHITEWATER WEST INDUSTRIES, LTD., a Canadian corporation,<br><br>Plaintiff,<br><br>v.<br><br>RICHARD ALLESHOUSE, an individual, YONG YEH, an individual, and PACIFIC SURF DESIGNS, INC., a Delaware Corporation,<br><br>Defendants. | CASE NO. **'17 CV 0501 LAB NLS**<br><br>**COMPLAINT FOR:**<br><br>**(1) BREACH OF WRITTEN CONTRACT;**<br>**(2) INTENTIONAL INTERFERENCE WITH CONTRACT;**<br>**(3) VIOLATION OF CAL. BUS. & PROF. CODE § 17200, *et seq.*; AND**<br>**(4) DECLARATORY RELIEF**<br>**(5) CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256 ('685 PATENT)**<br>**(6) CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256 ('189 PATENT)**<br>**(7) CORRECTION OF INVENTORSHIP UNDER 35 U.S.C. § 256 ('433 PATENT)**<br><br>**DEMAND FOR JURY TRIAL** |

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612-4410

- 1 -

COMPLAINT

Plaintiff Whitewater West Industries, Ltd. ("Plaintiff" or "Whitewater") complains and alleges against defendants Richard Alleshouse ("Alleshouse"), Yong Yeh ("Yeh"), and Pacific Surf Design, Inc. ("PSD"), as follows:

## NATURE OF ACTION

1. This is an action for correction of inventorship, breach of contract, intentional interference with contract, and unfair business practices arising under the patent laws of the United States, Title 35 of the United States Code, California common law, and California Bus. & Prof. Code § 17200, *et seq*. Plaintiff seeks damages, attorneys' fees, costs, pre-judgment and post-judgment interest, and injunctive and declaratory relief associated with its causes of action.

## THE PARTIES

2. At all times relevant hereto, Whitewater was and is a corporation incorporated in Canada with its principal place of business in Richmond, British Colombia, Canada.

3. Alleshouse is an individual who, on information and belief, resides in San Diego, California.  Alleshouse is PSD's Chief Operating Officer.

4. Yeh is an individual who, on information and belief, resides in Los Altos, California.  Yeh is PSD's Chief Executive Officer.

5. At all relevant times hereto, PSD is a Delaware corporation with its principal place of business in San Diego, California.

6. Whitewater is informed, believes, and based thereon alleges, that Defendants are, and at all times pertinent hereto were, the agents, servants, employees, joint venturers, and/or partners of each of the other co-Defendants, and in doing or failing to do the things alleged herein, each co-Defendant was acting within the scope of authority conferred upon that party by consent, approval and/or ratification of each of the other co-Defendants, whether said authority was actual or apparent.

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

**JURISDICTION & VENUE**

7.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1338(a) and 1367(a).

8.     This Court has personal jurisdiction over Alleshouse, Yeh, and PSD because they are present, doing business and/or residing in this District, because they have committed tortious acts and violated Plaintiff's rights in this District, and they knew or should have known that such conduct would cause injury to Plaintiff in the State of California.

9.     In the alternative, this Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 because there is diversity among the parties and the amount in controversy, without interest and costs, exceeds $75,000.

10.     Venue is proper in the United States District Court for the Southern District of California under 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

**GENERAL ALLEGATIONS**

11.     Whitewater brings this action as the current owner of these claims.  On or about April 29, 2014, Wave Loch, LLC ("Wave Loch") and its affiliate Wave House Global Pte. Ltd. assigned to Flowrider Surf, Ltd., a Canadian Corporation ("Flowrider"), a subsidiary of Whitewater, all of their rights and obligations under their Covenant Against Disclosure and Covenant Not To Compete with Alleshouse.  On February 1, 2016, Flowrider was amalgamated into Whitewater.  Amalgamation is a process under Canadian law whereby a subsidiary company is subsumed into its corporate parent and ceases to exist as a separate legal entity.  As a result, by operation of Canadian law, all of Flowrider's rights and interests, including those related to Defendants were automatically transferred to Whitewater.  Canada Business Corporations Act § 186(b), R.S.C., 1985, c.

///

///

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

- 3 -
COMPLAINT

## Alleshouse Is Employed By Wave Loch And Agrees That All Inventions Related To Alleshouse's Work Belong To Wave Loch Or Its Assignee

12.     Sheet wave attractions are water rides that have enjoyed high popularity in water parks, on cruise ships and in other venues.  Sheet wave attractions allow ride participants to simulate a surfing experience while on a stationary attraction.  Thomas Lochtefeld and his company, Wave Loch, pioneered the sheet wave attraction industry and many of its innovative and popular attractions and features.

13.     In September 2007, Wave Loch hired Alleshouse as a Field Engineer. On information and belief, prior to working at Wave Loch, Alleshouse had no experience with engineering or designing sheet wave attractions and had filed no patent applications or obtained patents on any subject matter.

14.     In September 2008, as a condition of his continued employment with Wave Loch, Alleshouse executed a Covenant Against Disclosure and Covenant Not To Compete with Wave Loch and a related entity, Wave House Global Pte. Ltd. (the "Agreement").  A true and correct copy of the Agreement is attached hereto as Exhibit 1.

15.     Among other things, the Agreement required that Alleshouse assign any inventions related to Wave Loch's business to Wave Loch:

In consideration of compensation paid by Company, Employee agrees that all right, title and interest in all inventions, improvements, developments, trade-secret, copyrightable or patentable material that Employee conceives or hereafter may make or conceive, whether solely or jointly with others:

(a) with the use of Company's time, materials, or facilities; or

(b) resulting from or suggested by Employee's work for Company; or

(c) in any way connected to any subject matter within the existing or contemplated business of Company shall automatically be deemed to

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

- 4 -
COMPLAINT

become the property of Company as soon as made or conceived, and Employee agrees to assign to Company, its successors, assigns, or nominees, all of Employee's rights and interests in said inventions, improvements, and developments in all countries worldwide. Employee's obligation to assign the rights to such inventions shall survive the discontinuance or termination of this Agreement for any reason.

Ex. 1, Agreement ¶ 2a.

16.    The Agreement also required Alleshouse to disclose any existing inventions over which he claimed ownership other than patents.  In response, Alleshouse stated "NONE."  Ex. 1, Agreement at p. 5.

17.    The Agreement further provides for prevailing party attorney's fees in any action brought to enforce the Agreement.  Ex. 1 at ¶ 9.

18.    Throughout his employment Alleshouse had broad engineering responsibilities.  Alleshouse was responsible for the entire sheet wave engineering function for Wave Loch's most popular product, the "Flowrider," and was privy to all of Wave Loch's efforts to develop new and different sheet wave attractions, including new concepts, designs, and drawings.

19.    For example, during Alleshouse's employment, Alleshouse participated in meetings with Wave Loch's founder Thomas Lochtefeld and other key Wave Loch employees, such as Andrew Thatcher, to discuss Wave Loch's plans to develop a quarter-pipe, half-pipe, or other sheet wave attractions with ride-able side walls instead of merely a flat riding surface.

20.    In 2010, Alleshouse was included in internal Wave Loch discussions regarding modifying nozzle shapes to improve flow on various Wave Loch products.

21.    Also in 2010, Wave Loch began to market a bowl shaped sheet wave attraction called WaveOz®, which includes nozzles at the base of the bowl.  The

COMPLAINT

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

WaveOz® sheet wave product was designed to create a larger ride surface allowing for multiple simultaneous riders.  Its bowl shape creates additional angles and surfaces allowing riders to perform more complex tricks and maneuvers that would not be possible on a traditional rectangular sheet wave attraction.  To direct water up the bowl, Wave Loch developed new nozzle shapes to direct and shape the water existing from the nozzle up the curved ride surface.  A copy of Wave Loch's marketing material for the WaveOz® sheet wave product is attached hereto as Exhibit 2.

22.     Wave Loch continued to explore and develop these products—sheet wave attractions with ride-able side walls and modified nozzle shapes to improve flow on various products—throughout Alleshouse's employment.

**Alleshouse Resigns From Wave Loch And Starts PSD With Yeh**

23.     On or about July 27, 2012, Alleshouse resigned his employment at Wave Loch.

24.     Within just a few weeks of resigning from Wave Loch, Alleshouse, along with Yeh, Alleshouse's friend and an attorney, co-founded PSD, a company that intended to compete with Wave Loch in the sheet wave attraction market.

25.     On information and belief, at the time Alleshouse and Yeh founded PSD, Yeh was aware of Alleshouse's prior employment at Wave Loch and Alleshouse's obligations under the Agreement.

26.     PSD's website touts Allehouse's prior employment at Wave Loch, stating: "Richard [Alleshouse] previously worked at Wave Loch Inc. as a field engineer, product manager and manufacturing engineering manager for over 5 years." A true and correct copy of PSD's "About Us" web page is attached hereto as Exhibit 3.

27.     On information and belief, prior to starting PSD, Yeh had no background or experience in sheet wave attractions or engineering of any kind, and had never

COMPLAINT

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612-4410

1  been listed as the inventor or co-inventor on any patent application.

2      28.    PSD immediately began to market sheet wave attractions similar to those

3  sold by Wave Loch and claimed to have filed patent applications which purported to

4  contain PSD's "innovations" related to sheet wave ride surface technologies.  To the

5  extent any applications had been filed, they were not immediately available for public

6  viewing.

7  **Alleshouse, Yeh, and PSD Improperly Claim Inventions Developed Using**

8  **Information Allehouse Learned At Wave Loch As Their Own**

9      29.    On or about April 17, 2014, the United States Patent and Trademark

10  Office ("USPTO") published PSD's first patent application, which was eventually

11  issued as U.S. Patent No. 9,044,685 (the "'685 Patent") on June 2, 2015.  The '685

12  Patent lists two inventors: Alleshouse and Yeh.  A continuation application published

13  on September 17, 2015 led to the issuance of U.S. Patent No. 9,302,189 (the "'189

14  Patent") on April 5, 2016 (collectively, the "Ride Patents").  The '189 Patent lists two

15  inventors: Alleshouse and Yeh.  True and correct copies of the Ride Patents are

16  attached hereto as Exhibits 4 and 5, respectively.

17      30.    Upon information and belief, Yeh, having no sheet wave engineering

18  experience, did not contribute to the conception of the idea or the subject matter of

19  any claim contained within the Ride Patents.

20      31.    On or about July 30, 2015, the USPTO published another patent

21  application by PSD, which was issued as U.S. Patent No. 9,592,433 (the "'433

22  Patent" or the "Nozzle Patent") at 12:00 a.m. Eastern Daylight Time on March 14,

23  2017 (or 9:00 p.m. Pacific Daylight Time on March 13, 2017).  The '433 Patent lists

24  only two inventors:  Alleshouse and Yeh.  A copy of the issued Nozzle Patent was

25  not available at the time of filing.

26      32.    Upon information and belief, Yeh, having no sheet wave engineering

27  experience, did not contribute to the conception of the idea or the subject matter of

28

COMPLAINT

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

1    any claim contained within the Nozzle Patent.

2        33.    Neither Whitewater nor its predecessors in interest to the Agreement,

3    Wave Loch and Flowrider, could have discovered the subject matter of the Ride

4    Patents or Nozzle Patent until they were published, and could not have brought a

5    claim to correct the inventorship of the Nozzle Patent until it was issued.

6        34.    The development of new sheet wave attraction designs and components

7    requires months if not years of work by a team of skilled and dedicated engineers.

8    Despite this fact and that Alleshouse had never filed a patent application before or

9    during his employment with Wave Loch, the published documents reveal that the

10   provisional application for the Ride Patents was filed on October 13, 2012, and the

11   provisional application for the Nozzle Patent was filed on October 24, 2012, fewer

12   than 90 days after Alleshouse resigned his employment at Wave Loch.  Thus,

13   Alleshouse either developed the asserted inventions while employed at Wave Loch,

14   used information he obtained at Wave Loch to develop the inventions, or both.

15        35.    Further, the subject matter of the inventions asserted in the Ride Patents

16   and Nozzle Patent relate directly to Wave Loch's, and now Whitewater's, business.

17        36.    The Ride Patents show a sheet wave attraction in the shape of a half-

18   pipe, and even directly reference half-pipe and quarter-pipe shapes for sheet wave

19   attractions.  Ex. 4 at p. 6; Ex. 5 at p. 6.  As alleged above in paragraph 19, this is

20   exactly the sort of sheet wave attraction that Wave Loch was in the process of

21   developing while Alleshouse was employed by Wave Loch.

22        37.    The Nozzle Patent relates to the design of nozzles to direct the flow of

23   water over sheet wave attractions.  As alleged above in paragraphs 20 and 21, this is

24   exactly the sort of design feature that Wave Loch had developed while Alleshouse

25   was employed by Wave Loch.  Moreover, the design drawings attached to the

26   application show a bowl-shaped sheet wave attraction with the nozzles beneath a

27   platform at the base of the bowl.  Ex. 6 at pp. 1-6.  These drawings were directly

28

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

1  copied from the designs of the WaveOz® sheet waver product.  See Ex. 2.

2      38.    Despite the fact that the inventions claimed in the Ride Patents and

3  Nozzle Patent were developed during Alleshouse's employment with Wave Loch,

4  result from Alleshouse's work at Wave Loch, and relate to Wave Loch's business,

5  Alleshouse failed to assign the ownership of those inventions to Wave Loch or its

6  assignee, Flowrider, or Flowrider's successor in interest, Whitewater, as required by

7  the Agreement.

8      39.    Instead, Alleshouse purported to assign the inventions to PSD.  True and

9  correct copies of documents filed with the USPTO assigning the Ride Patents and

10  Nozzle Patent to PSD are attached hereto as Exhibits 6 and 7, respectively.

11  **FIRST CAUSE OF ACTION**

12  **(Breach of Written Contract)**

13  (Against Defendant Alleshouse)

14      40.    Plaintiff re-alleges and incorporates herein by reference each and every

15  allegation set forth in Paragraphs 1 through 39, inclusive, as though set forth fully

16  herein.

17      41.    On or about September 8, 2008, Alleshouse and Wave Loch entered into

18  the Agreement.  Among other things, the Agreement stated that all rights to

19  inventions resulting from or suggested by Alleshouse's work for Wave Loch and

20  required that Alleshouse assign any such rights to Wave Loch, its successors, assigns,

21  or nominees.

22      42.    During the course of Alleshouse's employment, Alleshouse learned of

23  and/or participated in, Wave Loch's current or planned developments in sheet wave

24  technology including quarter- or half-piped shaped sheet wave attractions and nozzle

25  flow elements required for different shaped sheet wave attractions.

26      43.    Within 90 days following Alleshouse's resignation from Wave Loch,

27  Alleshouse filed the Ride Patents and Nozzle Patent claiming inventions either

28

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

COMPLAINT

developed while Alleshouse was employed at Wave Loch, using information he learned at Wave Loch, or both.

44.    Flowrider is Wave Loch's assignee of all rights under the Agreement. By operation of Canadian law, all rights and interests in the Agreement were automatically transferred to Whitewater.

45.    Whitewater and its predecessors in interest have performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement except for obligations the performance of which were excused on the ground of Alleshouse's breach.

46.    Alleshouse breached and continues to breach the Agreement by failing to assign inventions directly derived from Alleshouse's work at Wave Loch including the inventions that are the subject of the Ride Patents and the Nozzle Patent, and instead claiming those inventions belong to PSD.

47.    As a result of Alleshouse's breach, Whitewater has been damaged in the sum of at least $75,000 to be proven at trial.

## SECOND CAUSE OF ACTION

### Intentional Interference With Contract

(Against Defendants Yeh and PSD)

48.    Plaintiff re-alleges and incorporates herein by reference each and every allegation set forth in Paragraphs 1 through 47, inclusive, as though set forth fully herein.

49.    The Agreement constitutes a valid and existing contract between Wave Loch and Alleshouse; Wave Loch validly assigned its rights under the contract to Flowrider, and Whitewater assumed all rights to that assignment by virtue of amalgamating Flowrider.

50.    On information and belief, Yeh and PSD knew of the existence of the Agreement and of Alleshouse's obligations under the Agreement.

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

COMPLAINT

51.     By applying for the Nozzle Patent, Yeh and PSD intended to induce Allehouse's breach of the Agreement by claiming that the invention asserted in the Nozzle Patent is the property of PSD, and not of Wave Loch or its assignee, Whitewater as required by the Agreement.

52.     The acts of Yeh and PSD as alleged herein caused a breach of the Agreement in that Alleshouse has failed to assign ownership of the invention claimed in the Nozzle Patent to Wave Loch or its assignee, Whitewater.

53.     The acts of Yeh and PSD have damaged Whitewater in the sum of at least $75,000 to be proven at trial.

54.     The conduct of Yeh and PSD as alleged herein was undertaken with the intent to injure Whitewater, or with a willful and conscious disregard of the rights of Whitewater and constitutes oppressive, malicious, and fraudulent conduct warranting an award of punitive damages in an amount appropriate to punish or set an example of such Defendants.

## THIRD CAUSE OF ACTION

### Violation of Cal. Bus. & Prof. § 17200, *et seq.*

(Against Defendant PSD)

55.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 54, inclusive, as though set forth fully herein.

56.     PSD's interference with contract and exploitation of Whitewater's property for its own advantage as described above constitutes an unfair business practice in violation of Business and Professions Code § 17200, et seq.

57.     PSD's interference with contract also constitutes an unlawful business practice in violation of Business and Professions Code § 17200, et seq.

58.     As a result of PSD's unfair business practices, PSD has reaped unfair benefits and profits at the expense of Whitewater.  PSD should be made to disgorge

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

COMPLAINT

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

its ill-gotten gains and restore such monies to Whitewater in an amount according to proof.

59.     PSD's acts are willful, wanton, malicious, and oppressive, were undertaken with the intent to defraud, and justify the awarding of exemplary and punitive damages.

## FOURTH CAUSE OF ACTION

### Declaratory Relief

(Against All Defendants)

60.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 59, inclusive, as though set forth fully herein.

61.     An actual controversy now exists between Whitewater and Defendants. Whitewater contends that the inventions represented in the Ride Patents and Nozzle Patent are the property of Whitewater and are required to be assigned to Whitewater under the Agreement.  Whitewater is informed and believes that Defendants assert that those inventions are Defendants' property and are not required to be assigned to Whitewater.

62.     Whitewater desires a judicial determination of the respective rights, duties and obligations of the parties in connection with the matters herein alleged, and a judgment in favor of Whitewater as to such matters.

## FIFTH CAUSE OF ACTION

### Correction of Inventorship of the '685 Patent Under 35 U.S.C. § 256

(Against All Defendants)

63.     Plaintiff re-alleges and incorporates by reference each and every allegation set forth in Paragraphs 1 through 62, inclusive, as though set forth fully herein.

64.     The '685 Patent incorrectly identifies Yong Yeh as a co-inventor of the

- 12 -

COMPLAINT

1   inventions described and claimed.  On information and belief, Yong Yeh made no
2   individual, conceptual contributions to the inventions of the '685 Patent.

3        65.    As a result of the incorrect inventorship of the '685 Patent, Plaintiff has
4   been damaged and continues to suffer damages.

5        66.    Pursuant to 35 U.S.C. § 256, Plaintiff requests that the inventorship of
6   the '685 Patent be corrected by removing Yong Yeh as an inventor of the '685 Patent.

7                          **SIXTH CAUSE OF ACTION**

8        **Correction of Inventorship of the '189 Patent Under 35 U.S.C. § 256**

9                          (Against All Defendants)

10       67.    Plaintiff re-alleges and incorporates by reference each and every
11   allegation set forth in Paragraphs 1 through 66, inclusive, as though set forth fully
12   herein.

13       68.    The '189 Patent incorrectly identifies Yong Yeh as a co-inventor of the
14   inventions described and claimed.  On information and belief, Yong Yeh made no
15   individual, conceptual contributions to the inventions of the '189 Patent.

16       69.    As a result of the incorrect inventorship of the '189 Patent, Plaintiff has
17   been damaged and continues to suffer damages.

18       70.    Pursuant to 35 U.S.C. § 256, Plaintiff requests that the inventorship of
19   the '189 Patent be corrected by removing Yong Yeh as an inventor of the '189 Patent.

20                         **SEVENTH CAUSE OF ACTION**

21       **Correction of Inventorship of the '433 Patent Under 35 U.S.C. § 256**

22                         (Against All Defendants)

23       71.    Plaintiff re-alleges and incorporates by reference each and every
24   allegation set forth in Paragraphs 1 through 70, inclusive, as though set forth fully
25   herein.

26       72.    The '433 Patent incorrectly identifies Yong Yeh as a co-inventor of the
27   inventions described and claimed.  On information and belief, Yong Yeh made no

28

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA  92612-4410

- 13 -

COMPLAINT

individual, conceptual contributions to the inventions of the '433 Patent.

73.     As a result of the incorrect inventorship of the '433 Patent, Plaintiff has been damaged and continues to suffer damages.

74.     Pursuant to 35 U.S.C. § 256, Plaintiff requests that the inventorship of the '433 Patent be corrected by removing Yong Yeh as an inventor of the '433 Patent.

## **PRAYER**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     On Plaintiff's First and Second Causes of Action, for compensatory damages in the amount of at least $75,000 to be proven at trial;

2.     On Plaintiff's First and Second Causes of Action, for an injunction requiring Defendants to assign all rights to the inventions claimed in the Ride Patents and Nozzle Patent, including the Patents themselves, to Whitewater;

3.     On Plaintiff's Second, and Fourth Causes of Action, for punitive and exemplary damages according to proof;

4.     On Plaintiff's Third Cause of Action, for restitution and disgorgement in an amount to be proven at trial, and an injunction barring Defendants from exploiting, marketing, advertising, or otherwise using the Patents or Assignments

5.     On Plaintiff's Fourth Cause of Action, for a declaration that Whitewater is the rightful owner of the inventions claimed in the Ride Patents and Nozzle Patent;

6.     On Plaintiff's Fifth Cause of Action, for an order ordering that the records of the United States Patent and Trademark Office be corrected to remove Yong Yeh as an inventor for the '685 Patent, and that Defendants take all other reasonable and necessary actions to obtain such correction;

7.     On Plaintiff's Sixth Cause of Action, for an order ordering that the records of the United States Patent and Trademark Office be corrected to remove Yong Yeh as an inventor for the '189 Patent, and that Defendants take all other reasonable and necessary actions to obtain such correction;

8.     On Plaintiff's Seventh Cause of Action, for an order ordering that the records of the United States Patent and Trademark Office be corrected to remove Yong Yeh as an inventor for the '433 Patent, and that Defendants take all other reasonable and necessary actions to obtain such correction;

9.     For attorneys' fees and costs of suit; and

10.    For such other and further relief as the court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by jury.


DATED:   March 13, 2017              GREENBERG TRAURIG, LLP


                                     By: */s/ Roger L. Scott*
                                         Jeff E. Scott
                                         Roger L. Scott

                                         Attorneys for Plaintiff,
                                         Whitewater West Industries, Ltd.

GREENBERG TRAURIG, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612-4410

- 15 -

COMPLAINT

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

### *WHITEWATER WEST INDUSTRIES, LTD. v. RICHARD ALLESHOUSE, YONG YEH and PACIFIC SURF DESIGNS, INC.*

Case No. _____

## COMPLAINT

## TABLE OF EXHIBITS

| *EXHIBIT NUMBER* | *PAGE NUMBER* |
|:---:|:---:|
| Exhibit 1 | 1-5 |
| Exhibit 2 | 6-7 |
| Exhibit 3 | 8-9 |
| Exhibit 4 | 10-18 |
| Exhibit 5 | 19-27 |
| Exhibit 6 | 28-30 |
| Exhibit 7 | 31-32 |

*OC 287661146v1*

# EXHIBIT 1

## COVENANT AGAINST DISCLOSURE AND
## COVENANT NOT TO COMPETE

This Covenant against Disclosure and Covenant Not to Compete ("Agreement") is entered into by and between Wave Loch, Inc. / Wave House Global Pte. Ltd. (Collectively "Company") and Richard Alleshouse ("Employee") effective August ___, 2008. SEProber 8, 2008

IN CONSIDERATION FOR Company's hiring of Employee to perform services for Company and in consideration for the compensation to be paid to Employee, and regardless of the duration of such services, Employee agrees to perform to the best of Employee's ability all duties required by Company and agree to comply strictly with all conditions set forth in this Agreement. For the purpose of these conditions, Company shall include its divisions, affiliates, subsidiaries, associate companies, shareholders, members, employees, licensees, joint venture partners, or any successors thereof.

1.   Confidentiality.

   a.   Covenant against Disclosure.  Except as permitted by Company in writing, or as otherwise required by law, while Employee is performing services for Company, and at all times thereafter, Employee shall not divulge, furnish or make accessible to anyone or use in any way any confidential, proprietary or secret knowledge or information of Company that Employee has acquired or shall acquire while performing services for Company, whether developed by Employee or by others, concerning (i)  confidential, proprietary or secret inventions, compositions, methods of manufacture, discoveries, designs, drawings, models, processes, formulas, plans, devices, or material directly or indirectly useful in any aspect of the Company business, including but not limited to any information regarding sheet flow, stationary wave, moving reef, boat wave, surf pool, wave pool and ride surface technologies, (ii) customer lists, supplier lists or price lists, (iii)  computer programs or logical flow diagrams, (iv)  strategic or other business memoranda, manuals or forms, (v)  marketing or sales plans, (vi)  financial data or business models, or (vii) information identified as secret or confidential or which, from the circumstances, in good faith and conscience Employee should realize should be treated as confidential (collectively "Confidential Information").  Employee acknowledges that the above-described Confidential Information constitutes a unique and valuable asset of Company and represents a substantial investment of time and expense by Company, and that any disclosure or other use of such Confidential Information other than for the sole benefit of Company is wrongful and would cause irreparable harm to Company.

   b.   Removal or Publication of Confidential Information.  Employee will not remove from Company's premises, or make copies of, any Confidential Information except for use in Company's business.  Employee will not directly or indirectly publish, communicate, divulge, or describe to any unauthorized person nor patent any Confidential Information during the term of this Agreement or any time subsequent thereto.

   c.   Return of Records.  At any time requested by Company and upon completion of Employee's work for Company, Employee shall promptly deliver to Company any and all Company records and any and all Company property in Employee's possession or under

Exhibit 1
Page 1

Employee's control that may include, in whole or in part, Confidential Information, including, but not limited to: manuals, books, blank forms, documents, letters, memoranda, notes, notebooks, reports, printouts, computer disks, computer tapes, source codes, data, tables or calculations and all copies thereof. Employee further agrees to promptly return all keys, access cards, access codes, passwords, credit cards, personal computers, telephones and other electronic equipment belonging to Company.

2.    <u>Developments and Improvements</u>.

      a.    <u>Assignment</u>. In consideration of compensation paid by Company, Employee agrees that all right, title and interest in all inventions, improvements, developments, trade-secret, copyrightable or patentable material that Employee conceives or hereafter may make or conceive, whether solely or jointly with others:

      (a) with the use of Company's time, materials, or facilities; or

      (b) resulting from or suggested by Employee's work for Company; or

      (c) in any way connected to any subject matter within the existing or contemplated business of Company

shall automatically be deemed to become the property of Company as soon as made or conceived, and Employee agrees to assign to Company, its successors, assigns, or nominees, all of Employee's rights and interests in said inventions, improvements, and developments in all countries worldwide. Employee's obligation to assign the rights to such inventions shall survive the discontinuance or termination of this Agreement for any reason.

      b.    <u>Execution of Documents</u>. At any time requested by Company, either during the term of this Agreement or any time thereafter, and without charge to Company, Employee agrees to execute, acknowledge, and deliver all documents related to Developments and Improvements, and to perform such other lawful acts as, in the opinion of Company, may be necessary to obtain or maintain Company's interest in the Developments and Improvements, including but not limited to patents, copyrights and trademarks in any and all countries and to vest title thereto in Company, its successors, assigns, or nominees. Employee hereby appoints Company as its attorney-in-fact for the limited purpose of executing all documents and performing all other acts necessary to give effect and legality to the provisions of this Agreement. Where applicable, works of authorship created by Employee for Company in performing Employee's duties and responsibilities hereunder shall be considered "works made for hire," as defined in the U.S. Copyright Act.

      c.    <u>Required Record Keeping</u>. Employee agrees to make and maintain adequate and current written records of all such inventions, improvements, and developments in the form of notes, sketches, drawings, or reports relating thereto; which records shall be and remain the property of and be available to Company at all times, and Employee agrees to promptly disclose to Company all such inventions, improvements, and developments.

3.    <u>Covenant Not To Compete</u>. Employee covenants and agrees that Employee shall not use any Confidential Information to directly or indirectly (whether as principal, agent, director of a

2

Exhibit 1
Page 2

company, or otherwise) carry on, be engaged by, or take part in any commercial or business endeavor.

4.    Compliance Not Contingent upon Additional Consideration.  Employee has not been promised, and shall not claim, any additional or special compensation for any assignments or Employee's compliance with the covenants and agreements herein contained.

5.    Prior Inventions.  If, prior to the date of execution hereof, Employee has made or conceived of any unpatented inventions, improvements, or developments, whether patentable or unpatentable, which Employee desires to have excluded from this Agreement, Employee has written below Employee's name (and on an attached page, if necessary) a complete list thereof.

6.    Termination of Obligations.  The obligations of confidentiality and nondisclosure hereunder shall terminate only with respect to information that Employee can prove is in the public domain through no fault of Employee.

7.    Survival.  The provisions of Paragraphs 1, 2, 3 and 4 shall survive the termination of this Agreement.

8.    Injunctive Relief.  Employee expressly acknowledges that, in the event that the provisions of Paragraphs 1, 2 or 3 are breached, Company will suffer damages incapable of ascertainment and will be irreparably damaged if any provision of Paragraphs 1, 2 or 3 is not enforced.  Therefore, should any dispute arise with respect to the breach or threatened breach of any provision of Paragraphs 1, 2 or 3, Employee agrees and consents that, in addition to any and all other remedies available to Company, an injunction or restraining order or other equitable relief may be issued or ordered by a court of competent jurisdiction restraining any breach or threatened breach of any of such provisions.  Nothing herein shall be construed as prohibiting Company from pursuing any other remedies available to Company for such breach or threatened breach, including the recovery of damages from Employee.

9.    Recovery of Costs.  If any legal action or other proceeding, including any bankruptcy proceeding, is brought for the enforcement of the Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled.  "Prevailing party" within the meaning of this section includes, without limitation, a party who agrees to dismiss an action or proceeding upon the other's payment of sums allegedly due or performance of covenants allegedly breached, or who obtains substantially the relief sought by it.

10.    Miscellaneous.

    a.    This Agreement may not on behalf of or in respect to Company be changed or modified or released, discharged, abandoned, or otherwise terminated in whole or in part, except by an instrument in writing signed by the CEO of Company.

    b.    Employee represents that Employee has no agreements with or obligations to others in conflict with this Agreement.

3

Exhibit 1
Page 3

c.      This Agreement shall be binding upon Employee's heirs, executors, administrators, or other legal representatives or assigns.

d.      This Agreement may be executed contemporaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

e.      This Agreement is made and entered into in the State of California and shall be interpreted, construed, and enforced in accordance with the laws of the State of California, with venue for any action to be held in San Diego County, City of San Diego.

f.      Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law.  If any provision of this Agreement shall be invalid or prohibited by a court of competent jurisdiction, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

g.      No right or remedy conferred upon the parties is exclusive of any other right or remedy or by law provided or permitted, but each shall be cumulative of every right or remedy given hereunder or now or thereafter existing at law or otherwise, and may be enforced concurrently or from time to time.

[SIGNATURES ON NEXT PAGE]

4

Exhibit 1
Page 4

Employee's signature confirms that Employee has read, understands, and agrees to comply with the terms of this Agreement.

COMPANY
Wave Loch, Inc./
Wave House Global, Pte. Ltd.

By: _____

Its: _____COO_____

EMPLOYEE

Signature: _____

Print Name: _____Richard Alleshouse_____

### EXHIBIT "A"

List any unpatented inventions, improvements, and developments, whether patentable or unpatentable, made or conceived prior to the date of execution herewith which you desire to have excluded from the foregoing Agreement.

_____NONE_____

_____

_____

_____

_____

_____

_____

_____

NOTE — If none, write "NONE." Also, it is not necessary to record issued patents, pending patent applications, or prior inventions previously assigned or agreed to be assigned to others.

Exhibit 1
Page 5

# EXHIBIT 2





- Largest ride surface
- Outstanding visibility
- Versatile and customizable
- High capacity

WWW.WAVELOCH.COM

Exhibit 2
Page 6









Powered by ITT Flygt®
submersible propeller pumps



WaveOz is the latest innovation in our line of amazing sheet wave attractions. This exciting new attraction offers many design configurations. With different wave shapes it provides the largest available ride area. Utilizing 60 degree modules, WaveOz allows you to customize a wave in 120, 180, 240, 300 and 360 degree configurations providing outstanding visibility.

## SPECIFICATIONS FOR 180° WAVE:

Attraction footprint:
345 m^2 (3,750 sq.ft) Includes front access

System elevation:
Grade elevation is adjustable based on site
Assumes front nozzle deck 0 (at grade)
Height at back deck = 1,5m (5ft) variable
depending on final configuration
Tank depth= 3m

Capacity:
720 rides per hour (average 20 seconds each)
4 riders at a time

Electrical rating:
530KW @ 720Hp

Tank volume:
550,000 liters (150,000 gallons)

Riding vehicle:
Flowboards and Bodyboards

All specifications are subject to change without notice.

For Worldwide sales contact:



Wave Loch, Inc. 210 Westbourne St. La Jolla, Ca 92037
Tel: +1.858.454.1777  |  Fax: +1.858.454.1888
www.waveloch.com  |  sales@waveloch.com

The WaveOz sheet wave attraction is a proprietary technology covered by one or more of the following U.S. patents: 4,564,190; 4,792,260; 4,905,987; 4,954,014; 5,171,101; 5,213,547; 5,236,280; RE 34,407; 5,271,692; 5,393,170; 5,401,117; 5,421,782; 5,503,597; 5,564,859; 5,628,584; 5,664,910; 5,667,445; 5,738,590; 5,766,082; 5,860,766; 5,899,633; 5,911,190; 6,105,527; 6,132,317; 6,319,137; 6,460,201; 6,491,589; 6,676,530; 6,716,107; 6,738,992; 6,758,231; 6,920,670; 6,957,662; 7,040,994; RE 39,171 Other U.S. patents pending. Global coverage is provided by patents and pending applications in foreign countries.
© Copyright 2007 Wave Loch, Inc. All Rights Reserved.
WaveOz, Wave Loch, the World Wave logo, Wave House, and The Future of Nature are trademarks of Light Wave Ltd. and registered in the U.S. Patent and Trademark Office.

Exhibit 2
Page 7

# EXHIBIT 3



GUINNESS WORLD RECORDS    1.858.633.6009


| HOME | ABOUT US | OUR PRODUCTS | INNOVATIONS | NEWS AND EVENTS | FAQS | REPAIRS | CONTACT US |

# We don't just offer products; we provide solutions.



**GLOBAL EXPERIENCE**
Pacific Surf Designs team members have worked on sheet wave surfing attractions in these locations.

**WHAT WE DO:**  We at Pacific Surf Designs ® have years of experience designing, manufacturing, and installing sheet wave surf simulators for the waterpark, entertainment, leisure, retail, ski and restaurant industries as well as providing tailored solutions for private residences. Influenced by the exciting action sports industry, our attractions add the exhilarating medium of water to surface environments sought out by those addicted to surf, skate, snow, skim, wake and other boardsports alike.

Our innovative designs are focused on safety, reliability and fun to keep your customers entertained with the most cutting edge products in the industry in an environment that is user friendly and easy to maintain. We are dedicated to working with you on every detail of your project, from design through construction management, to ensure that a seamless installation is followed by years of enjoyment for you and your customers.

**WHY WE DO IT:**  We love to surf and we want to make it possible for people around the world to be able to surf anywhere.

**WHAT WE BELIEVE:**  We go about our business in the same manner as we go about our lives – we try to do things the right way. We understand that respecting cultural norms is just as important as finalizing a term sheet and it is our utmost priority to ensure that our products and services are of the highest quality without sacrificing our relationships with others.

**WHO WE ARE:**  We go about our business in the same manner as we go about our lives – we try to do things the right way. We understand that respecting cultural norms is just as important as finalizing a term sheet and it is our utmost priority to ensure that our products and services are of the highest quality without sacrificing our relationships with others.

**RICHARD ALLESHOUSE:** Linkedin profile, our COO, is based out of our San Diego location and holds a B.S. in Mechanical Engineering from U.C. Berkeley, an MBA from the U.C. San Diego Rady School of Management and is a registered Professional Engineer in the State of California. Richard has years of engineering experience in waterpark and construction management. He discovered his passion for combining his love for surfing with his engineering background through designing and building sheet wave surf simulators.

Richard previously worked at Wave Loch Inc. as a field engineer, product manager and manufacturing engineering manager for over 5 years. Eager to push design concepts and innovation in the industry, he found his outlet in Pacific Surf Designs.



**YONG YEH:** Linkedin profile, our CEO, is based out of our Silicon Valley location and holds a B.S. in Molecular and Cell Biology from U.C. Berkeley, a JD from the University of San Diego School of Law and an LLM from Georgetown University Law Center. He has years of corporate and tax law experience from top-tier law firms in New York (Weil, Gotshal & Manges) and Palo Alto (MoFo and Cooley). From his years working with dozens of different companies and serving as a VP of an emerging technology company, Yong has been exposed to numerous industries and types of companies. In addition, Yong has extensive experience working with companies abroad, including those in China, Japan, Korea, and throughout Europe. An

Exhibit 3
Page 8

1/2



entrepreneur at heart, Yong jumped on the opportunity to partner with Richard to start a company in an industry they had a shared passion.

**OUR TEAM:** We have assembled a team of seasoned veterans and experts pulled together from various industries, including sheet wave surf machines, restaurant planning and real estate development. What's more, many of our team members have been friends for years and have built an understanding and trust that can only be gained from time.



Pacific Surf Designs ®
4630 Santa Fe Street
San Diego, CA 92109
858.633.6009
info@pacificsurfdesigns.com




© 2016 by Pacific Surf Designs ®    **Made in the USA** 

# EXHIBIT 4

US009044685B2

(12) **United States Patent**
Alleshouse et al.

(10) Patent No.: **US 9,044,685 B2**
(45) Date of Patent: **Jun. 2, 2015**

(54) **WATER ATTRACTIONS INVOLVING A FLOWING BODY OF WATER**

(71) Applicant: **Pacific Surf Designs, Inc.**, San Diego, CA (US)

(72) Inventors: **Richard Alleshouse**, San Diego, CA (US); **Yong L Yeh**, Foster City, CA (US)

(73) Assignee: **Pacific Surf Designs, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/052,726**

(22) Filed: **Oct. 12, 2013**

(65) **Prior Publication Data**

US 2014/0106890 A1      Apr. 17, 2014

**Related U.S. Application Data**

(60) Provisional application No. 61/713,508, filed on Oct. 13, 2012.

(51) **Int. Cl.**
*A63G 21/18* (2006.01)
*A63G 31/00* (2006.01)

(52) **U.S. Cl.**
CPC .............. *A63G 31/007* (2013.01); *A63G 21/18* (2013.01)

(58) **Field of Classification Search**
CPC ....... A63G 21/00; A63G 31/18; A63G 31/00; A63G 31/02; A63G 31/007; A63H 23/00; A63H 23/10
USPC ........................ 472/13, 117, 128; 4/488, 505
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,171,101 | A * | 12/1992 | Sauerbier et al. | 405/79 |
| 5,738,590 | A * | 4/1998 | Lochtefeld | 472/117 |
| 6,491,589 | B1 * | 12/2002 | Lochtefeld | 472/117 |
| 7,547,255 | B2 * | 6/2009 | Lochtefeld | 472/90 |
| 2009/0275416 | A1 * | 11/2009 | Murphy | 472/128 |
| 2013/0130815 | A1 * | 5/2013 | Lochtefeld | 472/128 |

* cited by examiner

*Primary Examiner* — Kien Nguyen
(74) *Attorney, Agent, or Firm* — Hudak Consulting Group LLC

(57) **ABSTRACT**

A water attraction, involving a flowing body of water, for performing board-riding maneuvers is described. A water attraction according to the present invention includes an activity section adjacent a safety chute; opposing sidewalls adjacent to a safety chute; a water delivery section creating water flow towards a safety chute; a water recovery section; and a rideable surface area. The rideable surface area further includes irregularly shaped surfaces with varying angles and elevations to increase difficulty and creativity in board-riding maneuvers.

**19 Claims, 4 Drawing Sheets**



Exhibit 4
Page 10

**U.S. Patent**        Jun. 2, 2015        Sheet 1 of 4        US 9,044,685 B2



FIG. 1

FIG. 2

Exhibit 4
Page 11



FIG. 3

FIG. 4

FIG. 5

Exhibit 4
Page 12

FIG. 6



FIG. 7



Exhibit 4
Page 13



FIG. 8



FIG. 9

Exhibit 4
Page 14

US 9,044,685 B2

1

## WATER ATTRACTIONS INVOLVING A FLOWING BODY OF WATER

### INCORPORATION BY REFERENCE

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

### FIELD OF INVENTION

This invention relates to the field of water attractions, and more specifically, to water rides involving a flowing body of water having sufficient characteristics, including area, speed and thickness, to allow for surfboard, skimboard, snowboard, skateboard, bodyboarding, bodysurfing, inner-tubing style maneuvers or other water riding maneuvers (collectively, "boardriding maneuvers").

### BACKGROUND OF THE INVENTION

Conventional water attractions that allow for boardriding maneuvers, typically involve a flowing body of water. In these attractions, the flowing body of water is of such depth that the surface boundary layer effects of the flowing body of water over a limited number of wave forming surfaces significantly influence the rider's ability to perform boardriding maneuvers. Such "sheet flow" water attractions may simulate a stationary unbreaking ocean wave or, through the use of a naturally-occurring ocean wave shape, may create a stationary barreling wave.

Such existing "sheet flow" water attractions are limited in the number of boardriding maneuvers available to the rider as the shallow nature and speed of the flowing body of water and the limited number of wave forming surfaces restrict or limit the ability of the rider to perform a variety of boardriding maneuvers.

In addition, the number of riders capable of safely riding at one time on existing water attractions is limited due to design or physical limitations. Thus there is a need in the field of water attractions for new and useful water attractions that allow riders to perform a variety of boardriding maneuvers and allow for an increased number of riders to utilize the water attraction at one time in a manner that allows sufficient room for each individual rider to utilize the water attraction safely.

### SUMMARY OF THE INVENTION

The present invention relates to water attractions involving a flowing body of water on a surface which preferably allows a rider or riders to engage in boardriding maneuvers on surfaces that are irregular and may not resemble naturally-occurring ocean wave shapes. Such irregular shapes may possibly include, but are not limited to: quarter-pipes; half-pipes; table-tops; bowls; ramps; spines; elbows; and other similar shapes. Such irregular shapes may include half-pipes in which the sidewalls are parallel and/or non-parallel or a combination of both. Due to the nature of a flowing body of water, the sidewalls of the present invention are generally non-parallel to allow for the rider(s) to take advantage of more of the surface area of each sidewall. In existing "half-pipe" water attractions with parallel or substantially parallel sidewalls, the rider(s) is unable to take full advantage of the sidewall's surface area from the transition up to the lip line due to the

2

characteristics of water flowing in the vertical direction. In addition, the different forms of irregular shapes may be used independently or in conjunction or in combination with each other to create additional irregular shapes. Furthermore, shapes may be combined at varying angles and elevations to create surfaces allowing for boardriding maneuvers of increasing difficulty and creativity.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an isometric view of the present invention in the first variation depicting a half-pipe shape;

FIG. 2 is a top view of the present invention of FIG. 1;

FIG. 3 is another top view of the present invention of FIG. 1;

FIG. 4 is a longitudinal cross-section of the present invention of FIG. 1;

FIG. 5 is a transverse section of the present invention of FIG. 1;

FIG. 6 is an isometric view of the first variation of the water attraction depicting a quarter-pipe;

FIG. 7 is a top view of the present invention of FIG. 6;

FIG. 8 is a top view of the present invention of FIG. 6; and

FIG. 9 is a transverse section of the activity section of the present invention in FIG. 6.

### DETAILED DESCRIPTION OF SOME EMBODIMENTS

The following description of the preferred embodiments of the invention is not intended to limit the invention to this preferred embodiment, but rather to enable any person skilled in the art to make and use this invention.

Referring now to the invention in more detail, as shown in FIGS. 1-3, half-pipe water attraction 10 of a preferred embodiment includes sidewalls 18 adjacent to middle section 16 and sidewalls 20 adjacent to safety chute section 72. The sidewalls 18 and 20 may be either parallel or non-parallel sidewalls. The water attraction of the preferred embodiment preferably enables one or more riders to perform boardriding maneuvers. In some embodiments, as shown in FIG. 2, the water attraction 10 may further include a water delivery system 12. The water delivery system 12 preferably functions to create a flowing body of water moving in the direction of arrows 14 toward a safety chute section 72. The flowing body of water may flow over the middle section 16, over each sidewall 18, over each sidewall 20, to elevated water recovery sections 22, located at an elevation above where the sidewalls 18 terminate, to safety transition section 71, down declined sections 26, and to a water recovery section 24 in the rear of the embodiment, in which such water recovery section 24 may be at an elevation above or below the water delivery system 12. The water collected in the water recovery sections 22 and 24 may flow into a water retrieval section 30 (shown in FIG. 4) and returned to the water delivery system 12. The water delivery system 12 may include a pump or other fluid accelerating device. The water attraction 10 of the preferred embodiments preferably functions to enable a rider or riders to engage in boardriding maneuvers on surfaces that are irregular and may not resemble naturally-occurring ocean wave shapes. Such irregular shapes may possibly include, but are not limited to: quarter-pipes; half-pipes; table-tops; bowls; ramps; spines; elbows; and other similar shapes. Such irregular shapes may include half-pipes in which the sidewalls are parallel and/or non-parallel or a combination of both. In addition, the different forms of irregular shapes may be used independently or in conjunction or in combination

Exhibit 4
Page 15

US 9,044,685 B2

3

with each other to create additional irregular shapes. Furthermore, shapes may be combined at varying angles and elevations to create surfaces allowing for boardriding maneuvers of increasing difficulty and creativity. Furthermore, water attraction 10 of the preferred embodiments, preferably functions to enable an increased number of riders to utilize the water attraction at the same time in a manner that allows sufficient room for each individual rider to utilize the water attraction safely.

In more detail, still referring to the invention of FIGS. 1-3, there is shown an embodiment allowing a rider to perform boardriding maneuvers on the middle section 16 and each sidewall 18. The sidewalls 18 or 20 may be concave, planar or convex, or a combination of the aforementioned and may have the same radius of curvature or slope, or, in other embodiments, the non-planar sidewalls may have a varying radius of curvature or slope. The flowing body of water 14 creates an activity section by flowing onto both the middle section 16 and either or both sidewalls 18 in which a rider may perform boardriding maneuvers on the middle section 16 and on either or both sidewalls 18 in a continuous and unimpeded manner. The activity section may include surfaces that are irregular and may not resemble naturally-occurring ocean wave shapes. Such irregular shapes may possibly include, but are not limited to: quarter-pipes, half-pipes, table-tops, bowls, ramps, spines, elbows and other similar shapes. Such irregular shapes may include half-pipes in which the sidewalls 18 and 20 are parallel and/or non-parallel or a combination of both. In addition, the different forms of irregular shapes may be used independently or in conjunction or in combination with each other to create additional irregular shapes. Furthermore, shapes may be combined at varying angles and elevations to create surfaces allowing for boardriding maneuvers of increasing difficulty and creativity.

As shown in FIGS. 1-2, a rider exiting the activity section may be swept upon either water recovery section 22 and possibly upon safety transition section 71, down declined sections 26, and/or upon safety chute section 72, to water recovery section 24. The water recovery sections may include a surface having a plurality of apertures or slots. The water may flow through the slots or apertures such that it may be recovered and recycled through the system. The slots or apertures may be sized and configured such that a rider may safely stand or ride on the water recover section without tripping on or falling through the slots or apertures. A rider performing boardriding maneuvers upon the sidewall 18 may exit the activity section upon water recovery section 22, upon safety transition section 71, and possibly down declined section 26. A rider performing boardriding maneuvers upon the middle section 16 may exit the activity section upon the safety chute section 72 and/or water recovery section 24. The safety chute section 72 and the sidewalls 20 are designed to safely transition riders to the water recovery section 24.

In further detail, still referring to the invention of FIGS. 1-3, the surface of water attraction 10 is sufficiently smooth such that a rider may be safely swept over the surfaces of the water attraction including the middle section 16, sidewalls 18, water recovery sections 22, sidewalls 20, declined sections 26, safety transition section 71, safety chute section 72, and to water recovery section 24.

In order to construct the water attraction 10 of adequate size to fully accommodate individual and multiple riders, for purposes of scale and not limitation, referring to FIGS. 4 and 5, the dimensions of the middle section, which may be either planar or non-planar, 16 can be between 1 and 50 meters in length 32, between 0.05 and 5 meters in height 55, and between 1 and 30 meters in width 39, although the width may

4

be of such distance that is only limited by physical and cost restrictions. The height 35 of the sidewalls 18 can vary from 0.2 and 5 meters in height. As shown in FIG. 2, the downstream angle 21 of the sidewalls 18 can vary from 10 degrees to 60 degrees off from the sidewalls 20. The middle section 16 can be planar or slightly curved or curved.

The water attraction 10, including the activity section, may be made from a rigid or substantially rigid substrate such as concrete, metal, fiberglass, plastic or other similar material. The rigid or substantially rigid material may be covered in a layer of impact resistant padding covered with a substantially waterproof membrane and/or sealant.

Referring now to FIG. 3, there is shown a top view of the preferred embodiment 10, with section views 4 and 5, shown in FIGS. 4 and 5 respectively. Now referring to FIG. 4, depicting a longitudinal section view 4 through the water attraction 10, the water recovery section 24, feeds a water retrieval section 30 which functions to catch the water from the water recovery section 24 and allow the water to return to the front of the attraction where it can be redirected through the water directing mechanism 33, such as a nozzle, and re-distributed onto the ride surface 16 and either or both sidewalls 18 by the water delivery system 12. Although not depicted in the FIGURES, the water recovery section 22 also feeds a water retrieval section which allows water to return to the front of the attraction where it can be redirected through the water direction mechanism 33 and re-distributed onto the ride surface 16 and either or both sidewalls 18 by the water delivery system 12. The inclination 36, of the ride surface 16, can vary substantially from horizontal to an angle of 45°. The inclination 34 of the water recovery section 24, which drains water originating from the water delivery system 12, in which such water flows without a significant "change in direction." In this case, a "change in direction" is defined as altering the original flow direction by more than 160° in a plane substantially defined by the sheet of flowing water, before entering either water recovery section 22 or 24. The inclination 34 of the water recovery section may be between 0° and 30°.

Referring now to the transverse section through the preferred embodiment 10 in FIG. 5, there is a width component 39, to the middle section 16, which separates the sidewalls 18. The middle section 16 can be slightly curved or substantially planar. The sidewalls 18 can be shaped as a curve, including convex, concave, ellipse, complex curve shapes, or can be substantially planar depending on the desired ride shape. The final angle of inclination 37 of the sidewall 18 can vary significantly from 5° to a maximum of 150°, in which case the sidewall 18 may extend vertically over a portion of itself. Furthermore, the final angle of inclination may vary along the length 57 (as shown in FIG. 3) of the sidewall 18 and can be increasing, decreasing, or varying. The height 35 of the sidewalls 18 can vary between 0.05 meters and 10 meters. Furthermore, the height 35 of the sidewall 18 can vary along the length of a single sidewall 18 by increasing the height, decreasing the height, or a combination thereof along the length 57 of the sidewall 18 and can vary significantly from one sidewall 18 to the opposing sidewall 18. The length 57 of each respective sidewall 18 can vary significantly from a length of 1 meter to 50 meters, and other embodiments may have opposing sidewalls of different lengths.

Referring now to the invention as shown in FIGS. 6-8, an alternative preferred embodiment of the water attraction includes a sidewall 18, a sidewall 20, a water recovery section 22, a safety transition section 71, and a declined section 26 forming a quarter-pipe 40. On the opposite side of the sidewalls 18 and 42 of quarter-pipe 40, there is an angled sidewall 44 provided for safety purposes. The safety chute section 72,

Exhibit 4
Page 16

US 9,044,685 B2

5

sidewall **20** and a sidewall opposite sidewall **20** are designed to safely transition riders to the water recovery section **24**.

As shown in FIG. **7**, the width of the middle section **16** is of a width **62** that is only limited by cost and space restrictions. In this embodiment, the sidewall **18** may be oriented in such a way to the middle section **16** and the flow of water **14** such that one or more riders may perform boardriding maneuvers. The general operating characteristics of the quarter pipe embodiment **40** are similar to the first preferred embodiment **10** in which the water recovery section **24** feeds the water retrieval section **30** (as shown in FIG. **4**), which feeds the water directing mechanism **33** (as shown in FIG. **4**), which then feeds the flow of water **14** onto the middle section **16** and sidewall **42** via the water delivery system **12**. Furthermore, as shown in FIG. **9**, the angle **47** of the sidewall **18** can vary significantly, similarly to previously described angle **21** in the first preferred embodiment **10**. Furthermore, the height **54** of the final angle of inclination **56** may vary as described previously with respect to the first preferred embodiment **10** as may the height, width, and lengths of the respective surfaces.

Additional embodiments of this invention over which a body of water flows and creates a shape that appears in skateboard, snowboard and other action sports parks such as a bowl, hip, elbow, spine, and other shapes, may allow a rider or riders to ride up inclined sidewalls, substantially change directions, travel down the respective sidewall, across substantially flat or curved middle sections or other connection sidewalls, up separate sidewalls to once again substantially change direction, ride down the respective sidewall and back onto substantially flat middle sections. The body of water, after flowing over any substantially flat or curved middle sections and inclined sidewall(s), then may travel onto a water recovery section to be reused. In addition, such additional surface shapes may have a flowing body of water created by a water delivery system moving in a number of different directions and such water delivery system is configured in a manner that allows for a flowing body of water to travel over such additional surface shapes.

As a person skilled in the art will recognize from the previous detailed description and from the figures and claims, modifications and changes can be made to the preferred embodiments of the invention without departing from the scope of this invention defined in the following claims. Those of ordinary skill will understand and appreciate the existence of variations, combinations, and equivalents of the specific embodiment, method, and examples herein. The invention should therefore not be limited by the above described embodiment, method, and examples, but by all embodiments and methods within the scope and spirit of the invention.

What is claimed is:

**1**. A water attraction involving a flowing body of water on a surface configured for a rider or riders to engage in boardriding maneuvers, said water attraction comprising:

an activity section comprising:

a middle section adjacent to at least one safety chute section; and

a plurality of opposing parallel or non-parallel sidewalls, wherein the plurality of sidewalls are adjacent to the middle section and to the at least one safety chute section;

a water delivery section, wherein the water delivery section creates a flowing body of water over the middle section towards the at least one safety chute section;

a rideable surface on the plurality of side walls and the middle section, wherein the rideable surface is configured such that a rider or riders may ride up and down the plurality of sidewalls and over the middle section; and

6

a plurality of elevated water recovery sections positioned above the plurality of sidewalls.

**2**. The water attraction of claim **1**, wherein the plurality of opposing non-parallel sidewalls adjacent to the middle section are any shape chosen from a group consisting of one or more of: concave, planar, substantially planar, convex, ellipse, and complex curve shapes.

**3**. The water attraction of claim **2**, wherein a height of the plurality of sidewalls is between 0.05 meters and 10 meters.

**4**. The water attraction of claim **3**, wherein the height of the plurality of sidewalls varies along the length of a single sidewall and further varies between a first sidewall to a second opposing sidewall.

**5**. The water attraction of claim **2**, wherein a length of each sidewall is between 1 meter and 50 meters.

**6**. The water attraction of claim **1**, wherein a final angle of inclination of each of the plurality of sidewalls is between a minimum of 5° and a maximum of 150°.

**7**. The water attraction of claim **6**, wherein when the plurality of sidewalls has the final angle of inclination of 150°, each of the plurality of sidewalls extends vertically over a portion of itself.

**8**. The water attraction of claim **1**, wherein a final angle of inclination varies along a length of each of the plurality of sidewalls.

**9**. The water attraction of claim **1**, wherein the plurality of sidewalls adjacent to the middle section each have the same radius or curvature or slope.

**10**. The water attraction of claim **1**, wherein the plurality of sidewalls adjacent to the at least one safety chute section each have the same radius or curvature or slope.

**11**. The water attraction of claim **1**, wherein the elevated water recovery sections each includes a declined section leading to a second water recovery section in a rear portion of the water attraction.

**12**. The water attraction of claim **11**, wherein the second water recovery section is at an elevation that differs from an elevation of the water delivery system.

**13**. The water attraction of claim **1**, wherein the water recovery sections include a surface having a plurality of apertures or slots.

**14**. The water attraction of claim **1**, wherein the rideable surface of the water attraction is sufficiently smooth enough to enable a rider or riders to be swept over the surfaces of the water attraction.

**15**. The water attraction of claim **1**, wherein the activity section comprises a rigid or substantially rigid substrate.

**16**. The water attraction of claim **15**, wherein the rigid or substantially rigid substrate is covered in a layer of impact resistant padding covered with a substantially waterproof membrane and/or sealant.

**17**. The water attraction of claim **1**, wherein the middle section is slightly curved or substantially planar.

**18**. A water attraction involving a flowing body of water on a surface configured for a rider or riders to engage in boardriding maneuvers, said water attraction comprising:

a plurality of middle areas with a planar, curved or complexly curved geometry;

a plurality of opposing sidewall areas with either constant or varying geometry along their length;

a water delivery section, wherein the water delivery section creates a flowing body of water over the plurality of middle and sidewall areas;

at least one water recovery area adjacent to either the plurality of middle or sidewall areas;

a rideable surface on the plurality of middle and sidewall areas, wherein the rideable surface is configured such

Exhibit 4
Page 17

US 9,044,685 B2

7

8

that a rider or riders may ride up and down the plurality of sidewall areas and over the middle areas; and

additional sidewall areas, opposing or non-opposing, extending from the plurality of sidewall areas.

**19**. The water attraction of claim **18**, wherein the at least one water recovery area is coupled to the plurality of sidewall areas.

\* \* \* \* \*

Exhibit 4
Page 18

# EXHIBIT 5

US009302189B2

(12) **United States Patent**
Alleshouse et al.

(10) Patent No.: **US 9,302,189 B2**
(45) Date of Patent: **Apr. 5, 2016**

(54) **WATER ATTRACTIONS INVOLVING A FLOWING BODY OF WATER**

(71) Applicant: **Pacific Surf Designs, Inc.**, San Diego, CA (US)

(72) Inventors: **Richard Alleshouse**, San Diego, CA (US); **Yong L Yeh**, Foster City, CA (US)

(73) Assignee: **Pacific Surf Designs, Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/702,702**

(22) Filed: **May 2, 2015**

(65) **Prior Publication Data**

US 2015/0258460 A1      Sep. 17, 2015

**Related U.S. Application Data**

(63) Continuation of application No. 14/052,726, filed on Oct. 12, 2013, now Pat. No. 9,044,685.

(60) Provisional application No. 61/713,508, filed on Oct. 13, 2012.

(51) **Int. Cl.**
*A63G 21/18* (2006.01)
*A63G 31/00* (2006.01)

(52) **U.S. Cl.**
CPC .............. *A63G 31/007* (2013.01); *A63G 21/18* (2013.01)

(58) **Field of Classification Search**
CPC ....... A63G 21/00; A63G 31/00; A63G 31/02; A63G 31/007; A63G 31/18; A63H 23/00; A63H 23/10
USPC ................. 472/13, 117, 128, 129; 4/488, 505
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,171,101 A | 12/1992 | Sauerbier et al. | |
| 5,628,584 A * | 5/1997 | Lochtefeld | A63B 69/0093 405/52 |
| 5,738,590 A * | 4/1998 | Lochtefeld | A63B 69/0093 472/117 |
| 6,491,589 B1 | 12/2002 | Lochtefeld | |
| 7,547,255 B2 | 6/2009 | Lochtefeld | |
| 2009/0275416 A1 | 11/2009 | Murphy | |
| 2013/0130815 A1 | 5/2013 | Lochtefeld | |
| 2014/0106890 A1 | 4/2014 | Alleshouse | |

* cited by examiner

*Primary Examiner* — Kien Nguyen
(74) *Attorney, Agent, or Firm* — Hudak Consulting Group, LLC

(57) **ABSTRACT**

A water attraction, involving a flowing body of water, for performing board-riding maneuvers is described. A water attraction according to the present invention includes an activity section adjacent a safety chute; opposing sidewalls adjacent to a safety chute; a water delivery section creating water flow towards a safety chute; a water recovery section; and a rideable surface area. The rideable surface area further includes irregularly shaped surfaces with varying angles and elevations to increase difficulty and creativity in board-riding maneuvers.

**19 Claims, 4 Drawing Sheets**



Exhibit 5
Page 19



FIG. 1

FIG. 2

Exhibit 5
Page 20



Exhibit 5
Page 21

FIG. 6



FIG. 7



Exhibit 5
Page 22



FIG. 8



FIG. 9

Exhibit 5
Page 23

US 9,302,189 B2

1

## WATER ATTRACTIONS INVOLVING A FLOWING BODY OF WATER

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 14/052,726, entitled "Water Attractions Involving a Flowing Body of Water" and filed Oct. 12, 2013, which claims priority to U.S. Provisional Application No. 61/713, 508, entitled "Water Attractions Involving a Flowing Body of Water" and filed Oct. 13, 2012, both of which are incorporated by reference in their entireties.

### INCORPORATION BY REFERENCE

All publications and patent applications mentioned in this specification are herein incorporated by reference to the same extent as if each individual publication or patent application was specifically and individually indicated to be incorporated by reference.

### FIELD OF INVENTION

This invention relates to the field of water attractions, and more specifically, to water rides involving a flowing body of water having sufficient characteristics, including area, speed and thickness, to allow for surfboard, skimboard, snowboard, skateboard, bodyboarding, bodysurfing, inner-tubing style maneuvers or other water riding maneuvers (collectively, "boardriding maneuvers").

### BACKGROUND OF THE INVENTION

Conventional water attractions that allow for boardriding maneuvers, typically involve a flowing body of water. In these attractions, the flowing body of water is of such depth that the surface boundary layer effects of the flowing body of water over a limited number of wave forming surfaces significantly influence the rider's ability to perform boardriding maneuvers. Such "sheet flow" water attractions may simulate a stationary unbreaking ocean wave or, through the use of a naturally-occurring ocean wave shape, may create a stationary barreling wave.

Such existing "sheet flow" water attractions are limited in the number of boardriding maneuvers available to the rider as the shallow nature and speed of the flowing body of water and the limited number of wave forming surfaces restrict or limit the ability of the rider to perform a variety of boardriding maneuvers.

In addition, the number of riders capable of safely riding at one time on existing water attractions is limited due to design or physical limitations. Thus there is a need in the field of water attractions for new and useful water attractions that allow riders to perform a variety of boardriding maneuvers and allow for an increased number of riders to utilize the water attraction at one time in a manner that allows sufficient room for each individual rider to utilize the water attraction safely.

### SUMMARY OF THE INVENTION

The present invention relates to water attractions involving a flowing body of water on a surface which preferably allows a rider or riders to engage in boardriding maneuvers on surfaces that are irregular and may not resemble naturally-occurring ocean wave shapes. Such irregular shapes may pos-

2

sibly include, but are not limited to: quarter-pipes; half-pipes; table-tops; bowls; ramps; spines; elbows; and other similar shapes. Such irregular shapes may include half-pipes in which the sidewalls are parallel and/or non-parallel or a combination of both. Due to the nature of a flowing body of water, the sidewalls of the present invention are generally non-parallel to allow for the rider(s) to take advantage of more of the surface area of each sidewall. In existing "half-pipe" water attractions with parallel or substantially parallel sidewalls, the rider(s) is unable to take full advantage of the sidewall's surface area from the transition up to the lip line due to the characteristics of water flowing in the vertical direction. In addition, the different forms of irregular shapes may be used independently or in conjunction or in combination with each other to create additional irregular shapes. Furthermore, shapes may be combined at varying angles and elevations to create surfaces allowing for boardriding maneuvers of increasing difficulty and creativity.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an isometric view of the present invention in the first variation depicting a half-pipe shape;

FIG. **2** is a top view of the present invention of FIG. **1**;

FIG. **3** is another top view of the present invention of FIG. **1**;

FIG. **4** is a longitudinal cross-section of the present invention of FIG. **1**;

FIG. **5** is a transverse section of the present invention of FIG. **1**;

FIG. **6** is an isometric view of the first variation of the water attraction depicting a quarter-pipe;

FIG. **7** is a top view of the present invention of FIG. **6**;

FIG. **8** is a top view of the present invention of FIG. **6**; and

FIG. **9** is a transverse section of the activity section of the present invention in FIG. **6**.

### DETAILED DESCRIPTION OF SOME EMBODIMENTS

The following description of the preferred embodiments of the invention is not intended to limit the invention to this preferred embodiment, but rather to enable any person skilled in the art to make and use this invention.

Referring now to the invention in more detail, as shown in FIGS. **1**-**3**, half-pipe water attraction **10** of a preferred embodiment includes sidewalls **18** adjacent to middle section **16** and sidewalls **20** adjacent to safety chute section **72**. The sidewalls **18** and **20** may be either parallel or non-parallel sidewalls. The water attraction of the preferred embodiment preferably enables one or more riders to perform boardriding maneuvers. In some embodiments, as shown in FIG. **2**, the water attraction **10** may further include a water delivery system **12**. The water delivery system **12** preferably functions to create a flowing body of water moving in the direction of arrows **14** toward a safety chute section **72**. The flowing body of water may flow over the middle section **16**, over each sidewall **18**, over each sidewall **20**, to elevated water recovery sections **22**, located at an elevation above where the sidewalls **18** terminate, to safety transition section **71**, down declined sections **26**, and to a water recovery section **24** in the rear of the embodiment, in which such water recovery section **24** may be at an elevation above or below the water delivery system **12**. The water collected in the water recovery sections **22** and **24** may flow into a water retrieval section **30** (shown in FIG. **4**) and returned to the water delivery system **12**. The water delivery system **12** may include a pump or other fluid

Exhibit 5
Page 24

US 9,302,189 B2

3 | 4

accelerating device. The water attraction 10 of the preferred embodiments preferably functions to enable a rider or riders to engage in boardriding maneuvers on surfaces that are irregular and may not resemble naturally-occurring ocean wave shapes. Such irregular shapes may possibly include, but are not limited to: quarter-pipes; half-pipes; table-tops; bowls; ramps; spines; elbows; and other similar shapes. Such irregular shapes may include half-pipes in which the sidewalls are parallel and/or non-parallel or a combination of both. In addition, the different forms of irregular shapes may be used independently or in conjunction or in combination with each other to create additional irregular shapes. Furthermore, shapes may be combined at varying angles and elevations to create surfaces allowing for boardriding maneuvers of increasing difficulty and creativity. Furthermore, water attraction 10 of the preferred embodiments, preferably functions to enable an increased number of riders to utilize the water attraction at the same time in a manner that allows sufficient room for each individual rider to utilize the water attraction safely.

In more detail, still referring to the invention of FIGS. 1-3, there is shown an embodiment allowing a rider to perform boardriding maneuvers on the middle section 16 and each sidewall 18. The sidewalls 18 or 20 may be concave, planar or convex, or a combination of the aforementioned and may have the same radius of curvature or slope, or, in other embodiments, the non-planar sidewalls may have a varying radius of curvature or slope. The flowing body of water 14 creates an activity section by flowing onto both the middle section 16 and either or both sidewalls 18 in which a rider may perform boardriding maneuvers on the middle section 16 and on either or both sidewalls 18 in a continuous and unimpeded manner. The activity section may include surfaces that are irregular and may not resemble naturally-occurring ocean wave shapes. Such irregular shapes may possibly include, but are not limited to: quarter-pipes, half-pipes, table-tops, bowls, ramps, spines, elbows and other similar shapes. Such irregular shapes may include half-pipes in which the sidewalls 18 and 20 are parallel and/or non-parallel or a combination of both. In addition, the different forms of irregular shapes may be used independently or in conjunction or in combination with each other to create additional irregular shapes. Furthermore, shapes may be combined at varying angles and elevations to create surfaces allowing for boardriding maneuvers of increasing difficulty and creativity.

As shown in FIGS. 1-2, a rider exiting the activity section may be swept upon either water recovery section 22 and possibly upon safety transition section 71, down declined sections 26, and/or upon safety chute section 72, to water recovery section 24. The water recovery sections may include a surface having a plurality of apertures or slots. The water may flow through the slots or apertures such that it may be recovered and recycled through the system. The slots or apertures may be sized and configured such that a rider may safely stand or ride on the water recover section without tripping or falling through the slots or apertures. A rider performing boardriding maneuvers upon the sidewall 18 may exit the activity section upon water recovery section 22, upon safety transition section 71, and possibly down declined section 26. A rider performing boardriding maneuvers upon the middle section 16 may exit the activity section upon the safety chute section 72 and/or water recovery section 24. The safety chute section 72 and the sidewalls 20 are designed to safely transition riders to the water recovery section 24.

In further detail, still referring to the invention of FIGS. 1-3, the surface of water attraction 10 is sufficiently smooth such that a rider may be safely swept over the surfaces of the water attraction including the middle section 16, sidewalls 18, water recovery sections 22, sidewalls 20, declined sections 26, safety transition section 71, safety chute section 72, and to water recovery section 24.

In order to construct the water attraction 10 of adequate size to fully accommodate individual and multiple riders, for purposes of scale and not limitation, referring to FIGS. 4 and 5, the dimensions of the middle section, which may be either planar or non-planar, 16 can be between 1 and 50 meters in length 32, between 0.05 and 5 meters in height 55, and between 1 and 30 meters in width 39, although the width may be of such distance that is only limited by physical and cost restrictions. The height 35 of the sidewalls 18 can vary from 0.2 and 5 meters in height. As shown in FIG. 2, the downstream angle 21 of the sidewalls 18 can vary from 10 degrees to 60 degrees off from the sidewalls 20. The middle section 16 can be planar or slightly curved or curved.

The water attraction 10, including the activity section, may be made from a rigid or substantially rigid substrate such as concrete, metal, fiberglass, plastic or other similar material. The rigid or substantially rigid material may be covered in a layer of impact resistant padding covered with a substantially waterproof membrane and/or sealant.

Referring now to FIG. 3, there is shown a top view of the preferred embodiment 10, with section views 4 and 5, shown in FIGS. 4 and 5 respectively. Now referring to FIG. 4, depicting a longitudinal section view 4 through the water attraction 10, the water recovery section 24, feeds a water retrieval section 30 which functions to catch the water from the water recovery section 24 and allow the water to return to the front of the attraction where it can be redirected through the water directing mechanism 33, such as a nozzle, and re-distributed onto the ride surface 16 and either or both sidewalls 18 by the water delivery system 12. Although not depicted in the FIGURES, the water recovery section 22 also feeds a water retrieval section which allows water to return to the front of the attraction where it can be redirected through the water direction mechanism 33 and re-distributed onto the ride surface 16 and either or both sidewalls 18 by the water delivery system 12. The inclination 36, of the ride surface 16, can vary substantially from horizontal to an angle of 45°. The inclination 34 of the water recovery section 24, which drains water originating from the water delivery system 12, in which such water flows without a significant "change in direction." In this case, a "change in direction" is defined as altering the original flow direction by more than 160° in a plane substantially defined by the sheet of flowing water, before entering either water recovery section 22 or 24. The inclination 34 of the water recovery section may be between 0° and 30°.

Referring now to the transverse section through the preferred embodiment 10 in FIG. 5, there is a width component 39, to the middle section 16, which separates the sidewalls 18. The middle section 16 can be slightly curved or substantially planar. The sidewalls 18 can be shaped as a curve, including convex, concave, ellipse, complex curve shapes, or can be substantially planar depending on the desired ride shape. The final angle of inclination 37 of the sidewall 18 can vary significantly from 5° to a maximum of 150°, in which case the sidewall 18 may extend vertically over a portion of itself. Furthermore, the final angle of inclination may vary along the length 57 (as shown in FIG. 3) of the sidewall 18 and can be increasing, decreasing, or varying. The height 35 of the sidewalls 18 can vary between 0.05 meters and 10 meters. Furthermore, the height 35 of the sidewall 18 can vary along the length of a single sidewall 18 by increasing the height, decreasing the height, or a combination thereof along the length 57 of the sidewall 18 and can vary significantly from

Exhibit 5
Page 25

US 9,302,189 B2

5

one sidewall **18** to the opposing sidewall **18**. The length **57** of each respective sidewall **18** can vary significantly from a length of 1 meter to 50 meters, and other embodiments may have opposing sidewalls of different lengths.

Referring now to the invention as shown in FIGS. **6-8**, an alternative preferred embodiment of the water attraction includes a sidewall **18**, a sidewall **20**, a water recovery section **22**, a safety transition section **71**, and a declined section **26** forming a quarter-pipe **40**. On the opposite side of the sidewalls **18** and **42** of quarter-pipe **40**, there is an angled sidewall **44** provided for safety purposes. The safety chute section **72**, sidewall **20** and a sidewall opposite sidewall **20** are designed to safely transition riders to the water recovery section **24**.

As shown in FIG. **7**, the width of the middle section **16** is of a width **62** that is only limited by cost and space restrictions. In this embodiment, the sidewall **18** may be oriented in such a way to the middle section **16** and the flow of water **14** such that one or more riders may perform boardriding maneuvers. The general operating characteristics of the quarter pipe embodiment **40** are similar to the first preferred embodiment **10** in which the water recovery section **24** feeds the water retrieval section **30** (as shown in FIG. **4**), which feeds the water directing mechanism **33** (as shown in FIG. **4**), which then feeds the flow of water **14** onto the middle section **16** and sidewall **42** via the water delivery system **12**. Furthermore, as shown in FIG. **9**, the angle **47** of the sidewall **18** can vary significantly, similarly to previously described angle **21** in the first preferred embodiment **10**. Furthermore, the height **54** of the final angle of inclination **56** may vary as described previously with respect to the first preferred embodiment **10** as may the height, width and lengths of the respective surfaces.

Additional embodiments of this invention over which a body of water flows and creates a shape that appears in skateboard, snowboard and other action sports parks such as a bowl, hip, elbow, spine, and other shapes, may allow a rider or riders to ride up inclined sidewalls, substantially change directions, travel down the respective sidewall, across substantially flat or curved middle sections or other connection sidewalls, up separate sidewalls to once again substantially change direction, ride down the respective sidewall and back onto substantially flat middle sections. The body of water, after flowing over any substantially flat or curved middle sections and inclined sidewall(s), then may travel onto a water recovery section to be reused. In addition, such additional surface shapes may have a flowing body of water created by a water delivery system moving in a number of different directions and such water delivery system is configured in a manner that allows for a flowing body of water to travel over such additional surface shapes.

As a person skilled in the art will recognize from the previous detailed description and from the figures and claims, modifications and changes can be made to the preferred embodiments of the invention without departing from the scope of this invention defined in the following claims. Those of ordinary skill will understand and appreciate the existence of variations, combinations, and equivalents of the specific embodiment, method, and examples herein. The invention should therefore not be limited by the above described embodiment, method, and examples, but by all embodiments and methods within the scope and spirit of the invention.

What is claimed is:

**1**. A water attraction configured for a rider to engage in board-riding maneuvers over a flowing body of water, said water attraction comprising:

  a water delivery section having a nozzle configured to create a flow of water;

6

  a first water recovery section positioned downstream of the water delivery section;

  an activity section comprising: a rideable planar or curved section positioned between the water delivery section and the first water recovery section, and a first rideable sidewall adjacent to the rideable planar or curved section, wherein the first rideable sidewall is non-parallel to the water delivery section and oriented such that the nozzle directs the flow of water up onto and over the first rideable sidewall at a non-parallel angle relative to the first rideable sidewall: and

  a second water recovery section positioned atop the first rideable sidewall.

**2**. The water attraction of claim **1**, further comprising a declined section connecting the second water recovery section and the first water recovery section.

**3**. The water attraction of claim **1**, wherein the first rideable sidewall is a shape chosen from a group consisting of one or more of: concave, planar, substantially planar, convex, ellipse, and a complex curve shape.

**4**. The water attraction of claim **1**, wherein a final angle of inclination of the first rideable sidewall is between 5° and 150°.

**5**. The water attraction of claim **1**, wherein a final angle of inclination varies along a length of the first rideable sidewall.

**6**. The water attraction of claim **1**, wherein a height of the first rideable sidewall is between 0.05 meters and 10 meters.

**7**. The water attraction of claim **6**, wherein the height of the first rideable sidewall varies along a length of the first rideable sidewall.

**8**. The water attraction of claim **1**, wherein a length of the first rideable sidewall is between 1 meter and 50 meters.

**9**. The water attraction of claim **1**, wherein a rideable surface covers the activity section.

**10**. The water attraction of claim **9**, wherein the rideable surface of the water attraction is sufficiently smooth enough to enable a rider or riders to be swept over the surfaces of the water attraction.

**11**. The water attraction of claim **1**, wherein the activity section comprises a rigid or substantially rigid substrate.

**12**. The water attraction of claim **11**, wherein the rigid or substantially rigid substrate is covered in a layer of impact resistant padding covered with a substantially waterproof membrane and/or sealant.

**13**. The water attraction of claim **11**, wherein the rigid or substantially rigid material is selected from a group consisting of one or more of: concrete, metal, fiberglass, and plastic.

**14**. The water attraction of claim **1**, further comprising a safety chute section and a safety chute sidewall positioned between the activity section and the first water recovery section.

**15**. The water attraction of claim **14**, wherein the safety chute sidewall is oriented at a non-parallel angle relative to the first rideable sidewall.

**16**. The water attraction of claim **1**, further comprising a safety sidewall offset from the first rideable sidewall on an opposing side of the rideable planar or curved section.

**17**. The water attraction of claim **1**, further comprising a second rideable sidewall positioned parallel or nonparallel to the first rideable sidewall, wherein the second rideable sidewall is offset from the first rideable sidewall on an opposing side of the rideable planar or curved section.

**18**. The water attraction of claim **1**, wherein the first rideable sidewall forms a quarter-pipe.

Exhibit 5
Page 26

US 9,302,189 B2

7                                                          8

**19**. The water attraction of claim **1**, wherein the first rideable sidewall is concave and has a uniform radius of curvature.

*   *   *   *   *

Exhibit 5
Page 27

# EXHIBIT 6

## ASSIGNMENT OF PATENT APPLICATION

JOINT

WHEREAS, **Richard Alleshouse** and **Yong Yeh**, hereinafter referred to as "Assignors," are the inventors of the invention described and set forth in the below-identified application for United States Letters Patent:

Title of Invention:   **WATER ATTRACTIONS INVOLVING A FLOWING BODY OF WATER**

Application No:     14/052,726                                           ; and

Filing Date:        October 12, 2013

WHEREAS, **Pacific Surf Designs, Inc.** located at 3266 Via Bartolo, San Diego, California  92111 hereinafter referred to as "Assignee," is desirous of acquiring an interest in the invention and application and in any U.S. Letters Patent and Registrations which may be granted on the same;

For good and valuable consideration, receipt of which is hereby acknowledged by Assignors, Assignors have assigned, and by these presents do assign to Assignee all right, title and interest in and to the invention and application and to all foreign counterparts (including patent, utility model and industrial designs), and in and to any Letters Patent and Registrations which may hereafter be granted on the same in the United States and all countries throughout the world, and to claim the priority from the application as provided by the Paris Convention.  The right, title and interest is to be held and enjoyed by Assignee and Assignee's successors and assigns as fully and exclusively as it would have been held and enjoyed by Assignors had this Assignment not been made, for the full term of any Letters Patent and Registrations which may be granted thereon, or of any division, renewal, continuation in whole or in part, substitution, conversion, reissue, prolongation or extension thereof.

Assignors further agree that they will, without charge to Assignee, but at Assignee's expense, (a) cooperate with Assignee in the prosecution of U.S. Patent applications and foreign counterparts on the invention and any improvements, (b) execute, verify, acknowledge and deliver all such further papers, including patent applications and instruments of transfer, and (c) perform such other acts as Assignee lawfully may request to obtain or maintain Letters Patent and Registrations for the invention and improvements in any and all countries, and to vest title thereto in Assignee, or Assignee's successors and assigns.

Exhibit 6
Page 28

Assignment
Page 2

IN TESTIMONY WHEREOF, Assignors have signed their names on the dates
indicated.

Dated: 10/11/2013

Richard Alleshouse

Dated:

Yong Yeh

Exhibit 6
Page 29
2/2

PATENT
REEL: 031396 FRAME: 0040

Assignment
Page 3

IN TESTIMONY WHEREOF, Assignors have signed their names on the dates indicated.

Dated:

**Richard Adleshouse**

Dated:

**Yong Yoh**

Exhibit 6
Page 30

Handy Second Amendment 01/12 **RECORDED: 10/12/2013**

**PATENT**
**REEL: 031396 FRAME: 0041**

# EXHIBIT 7

## ASSIGNMENT OF PATENT APPLICATION

JOINT

WHEREAS, **Richard Alleshouse** and **Yong Yeh**, hereinafter referred to as "Assignors," are the inventors of the invention described and set forth in the below-identified application for United States Letters Patent:

| | |
|---|---|
| Title of Invention: | **NOZZLE SHAPES AND CONFIGURATIONS FOR WATER ATTRACTIONS INVOLVING A FLOWING BODY OF WATER** |
| Application No: | 14/062,857_____; and |
| Filing Date: | October 24, 2013_____ |

WHEREAS, **Pacific Surf Designs, Inc.** located at 3266 Via Bartolo, San Diego, California 92111 hereinafter referred to as "Assignee," is desirous of acquiring an interest in the invention and application and in any U.S. Letters Patent and Registrations which may be granted on the same;

For good and valuable consideration, receipt of which is hereby acknowledged by Assignors, Assignors have assigned, and by these presents do assign to Assignee all right, title and interest in and to the invention and application and to all foreign counterparts (including patent, utility model and industrial designs), and in and to any Letters Patent and Registrations which may hereafter be granted on the same in the United States and all countries throughout the world, and to claim the priority from the application as provided by the Paris Convention. The right, title and interest is to be held and enjoyed by Assignee and Assignee's successors and assigns as fully and exclusively as it would have been held and enjoyed by Assignors had this Assignment not been made, for the full term of any Letters Patent and Registrations which may be granted thereon, or of any division, renewal, continuation in whole or in part, substitution, conversion, reissue, prolongation or extension thereof.

Assignors further agree that they will, without charge to Assignee, but at Assignee's expense, (a) cooperate with Assignee in the prosecution of U.S. Patent applications and foreign counterparts on the invention and any improvements, (b) execute, verify, acknowledge and deliver all such further papers, including patent applications and instruments of transfer, and (c) perform such other acts as Assignee lawfully may request to obtain or maintain Letters Patent and Registrations for the invention and improvements in any and all countries, and to vest title thereto in Assignee, or Assignee's successors and assigns.

Exhibit 7
Page 31

Assignment
Page 2

IN TESTIMONY WHEREOF, Assignors have signed their names on the dates indicated.

Dated: _____ October 28, 2013 _____    _____
                                              **Richard Alleshouse**

Dated: _____ October 28, 2013 _____    _____
                                              **Yong Yeh**

Exhibit 7
Page 32

**RECORDED: 10/28/2013**                    **PATENT**
                                 **REEL: 031494 FRAME: 0011**