1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

WHITEWATER WEST
INDUSTRIES, LTD., a Canadian
corporation,

            Plaintiff,

    v.

RICHARD ALLESHOUSE, an
individual, YONG YEH, an
individual, and PACIFIC SURF
DESIGNS, INC., a Delaware
corporation,

            Defendants.

Case No. 17-cv-00501 DMS (NLS)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

       Defendant Richard Alleshouse was previously employed by Wave Loch, Inc., where he and his company designed, built and sold large, sophisticated water rides known as sheet wave rides which were commonly used in amusement parks by surfers and other wave riding enthusiasts.  Mr. Alleshouse learned the art of making these rides while employed at Wave Loch.  After nearly five years of employment, Mr. Alleshouse separated from Wave Loch.  Soon thereafter, he and his business partner Defendant Yong Yeh filed three patents for sheet wave rides and a water nozzle aperture that produced rideable waves for the rides.  Plaintiff Whitewater West Industries, LTD ("Whitewater"), a successor in interest to Wave Loch, Inc.,

    

claims that the inventive ideas behind these patents originated from Mr. Alleshouse's work at Wave Loch, and that Mr. Alleshouse has violated his contractual obligations to assign such inventions to Wave Loch and its successor in interest Whitewater. Plaintiff Whitewater now brings suit against Messrs. Alleshouse and Yeh, and their company, Pacific Surf Designs, Inc. ("PSD"), for breach of contract and related claims.

The matter was tried to the Court on February 4, 2019.  Roger Scott, Joseph Tache, Gary Wolensky, and Deborah Mallgrave appeared on behalf of Plaintiff. Charanjit Brahma, Mark Mao, and Stacy Hovan appeared on behalf of Defendants. For the reasons set forth below, the Court finds in favor of Plaintiff on its claims for breach of contract, correction of inventorship and declaratory relief and finds in favor of Defendants on the balance of the claims.

## I.

## FINDINGS OF FACT

### A.    Agreement Between Wave Loch, Inc. and Richard Alleshouse

Wave Loch, Inc. was a company that developed, manufactured, and sold sheet wave attractions.  (Testimony of Marshall Myrman ("Myrman Testimony") at 90–91.)  It now operates as a holding company for Wave House Holdings, LLC—which is a holding company for Wave Loch LLC and Wave House International. (Testimony of Thomas Lochtefeld ("Lochtefeld Testimony") at 513–14.)   These related Wave Loch entities are owned by Thomas Lochtefeld, the inventor of sheet wave attractions.   (Testimony of Geoff Chutter ("Chutter Testimony") at 46; Myrman Testimony at 90.)  Sheet wave rides allow participants to perform surfing-like maneuvers over a stationary surface.  The nozzles of the rides create the sheet-like flow of water that mimics waves or water flow commonly experienced in the ocean.   (Myrman Testimony at 102; Lochtefeld Testimony at 503, 519–29.)

In October 2007, Wave Loch, Inc. hired Mr. Alleshouse as an engineer. (Testimony of Richard Alleshouse ("Alleshouse Testimony") at 183–84.)

Approximately eleven months later, on September 8, 2008, Mr. Alleshouse entered into a Covenant against Disclosure and Covenant Not to Compete ("Agreement") with Wave Loch, Inc./Wave House Global Pte. Ltd. ("Company") and "successors thereof." (Pl.'s Ex. 6) The Agreement contained a number of provisions that addressed the confidential nature of Wave Loch's business and Mr. Alleshouse's obligations with respect to the proprietary information and ideas he was exposed to at work. The Agreement included a covenant against disclosure of confidential information, (*id.* ¶ 1.a.), a covenant not to use confidential information to "carry on" a competing business, (*id.* ¶ 3.), and an assignment provision providing that inventions, improvements and developments derived from employment belonged to Wave Loch, Inc. and had to be assigned by the employee to the company. (*Id.* ¶ 2.a.) Specifically, the assignment provision provides:

> In consideration of compensation paid by Company, Employee agrees that all right, title and interest in all inventions, improvements, developments, trade-secret, copyrightable or patentable material that Employee conceives or hereafter may make or conceive, whether solely or jointly with others:
>
> > (a) with the use of Company's time, materials, or facilities; or
> >
> > (b) resulting from or suggested by Employee's work for Company; or
> >
> > (c) in any way connected to any subject matter within the existing or contemplated business of the Company
>
> shall automatically be deemed to become the property of Company as soon as made or conceived, and Employee agrees to assign to Company, its successors, assigns, or nominees, all of Employee's rights and interests in said inventions, improvements, and developments in all countries worldwide. Employee's obligation to assign the rights to such inventions shall survive the discontinuance or termination of this Agreement for any reason.

(*Id.*)

On January 1, 2009, Mr. Lochtefeld reorganized Wave Loch, Inc. to Wave Loch LLC after being advised that a limited liability company would be better for

"tax purposes, investment, and flexibility for the future." (Pl.'s Ex. 162; Lochtefeld Testimony at 514–17.) Pursuant to the organizational document, Wave Loch, Inc.'s assets were transferred to Wave Loch LLC. (Pl.'s Ex. 162 (providing for transfer of "enterprise value" of Wave Loch, Inc. to Wave Loch LLC).) The transfer of Wave Loch, Inc.'s "enterprise value" operated to transfer all of Wave Loch, Inc.'s assets, including its employment contracts. (Lochtefeld Testimony at 517 ("[I]n order for Wave Loch LLC to operate, it needed those contracts and agreements[,] so everything went over.")) Consistent with the transfer of all assets, Wave Loch, Inc.'s employees were informed of the reorganization. (Lochtefeld Testimony at 574.) The employees did not experience any noticeable changes during or after the reorganization. (Myrman Testimony at 91; Thatcher Testimony at 158; Alleshouse Testimony at 194.) They continued the same job, received the same pay, worked in the same location, worked with the same group, and reported to the same people. (Alleshouse Testimony at 194–95; Myrman Testimony at 91–92.) They were not required to sign new agreements with Wave Loch LLC. (Lochtefeld Testimony at 514.)

On January 31, 2014, Wave Loch LLC transferred all its rights and interests in the sheet wave business to Flowrider Surf Ltd. ("Flowrider"), a Canadian entity. (Pl.'s Ex. 70; Lochtefeld Testimony at 569.) The contribution agreement specifically included a transfer of "books, files, papers, agreements, correspondence, databases, information systems, programs, software, documents, records and documentation thereof related to any of the Contributed Assets or the Assumed Liabilities, or used in the conduct of the Business, on whatever medium[.]" (Pl.'s Ex. 70 at 2.) Mr. Lochtefeld executed the contribution agreement on behalf of Wave Loch LLC, and Geoff Chutter executed the agreement on behalf of Flowrider. (Pl.'s Ex. 70 at 16.) Mr. Chutter was the president and CEO of Flowrider, and is now the president and CEO of Whitewater. (Chutter Testimony at 42.)

In addition to the contribution agreement, on April 29, 2014, Flowrider and Wave Loch, Inc. entered into an agreement that specifically assigned Mr. Alleshouse's obligations under the Agreement to Flowrider. (Defs.' Ex. DR; Lochtefeld Testimony at 569–70.) On February 1, 2016, Flowrider amalgamated into Whitewater pursuant to Canadian law. (Pl.'s Ex. 146.)

**B.    Richard Alleshouse's Employment**

Mr. Alleshouse's job description at Wave Loch included "extensive field work on [the] FlowRider and other WaveLoch attractions" as well as "research and design work improving existing rides and developing new rides[.]" (Pl.'s Ex. 2; Alleshouse Testimony at 184–86.) Marshall Myrman, then Chief Operating Officer of Wave Loch, [1] planned to make Mr. Alleshouse his successor. (Myrman Testimony at 88–94, 113–14.)

In addition to the responsibilities listed in his job description, Mr. Alleshouse was the product manager for the Flowrider—a sheet wave attraction that uses a rectangular flow nozzle. (Myrman Testimony at 94; Locthefeld Testimony at 429, 503; Testimony of Yong Yeh ("Yeh Testimony") at 705.) He was also responsible for documenting and finalizing the design drawings for the WaveOz, another sheet wave attraction. (Pl.'s Exs. 38, 40; Myrman Testimony at 102–08.) The WaveOz is shaped like a 180-degree punch bowl and uses a radial flow nozzle to direct water up the bowl. (Myrman Testimony at 103–08; Alleshouse Testimony at 320–21.) Oriol Vicente, an engineer at Wave Loch, was the product manager for the WaveOz. (Myrman Testimony at 95–100.) Mr. Alleshouse had access to Mr. Vicente's models and drawings of the WaveOz and its nozzle structure, which were stored in their shared office and company server. (Pl.'s Ex. 162; Thatcher Testimony at 163–66.) He also attended meetings involving the discussion of the WaveOz nozzle. (Pl.'s Ex. 37; Myrman Testimony at 104.) Wave Loch considered obtaining a patent

---

[1] Mr. Myrman is currently the president of Flowrider. (Myrman Testimony at 88–89.)

for the WaveOz radial flow nozzle, but ultimately did not do so.  (Myrman Testimony at 107–08, 124.)

In 2010 or 2011, Wave Loch learned that a competitor, Murphy's Waves, had developed a half-pipe ride called the Stingray.  (*Id.* at 108–12.)  The Stingray had curved sidewalls and water flowing up an inclined surface.  (*Id.*)  However, the sidewalls were not effectively rideable.  (*Id.*)  Wave Loch had meetings to improve upon the design of the Stingray by making the sidewalls rideable.  (*Id.* at 107–12, 124; Lochtefeld Testimony at 527–28; Thatcher Testimony at 169.)  Mr. Alleshouse participated in these meetings, as attested to by three prior Wave Loch employees.  (*Id.*)  One of those employees, Andrew Thatcher,[2] recalls Mr. Alleshouse stating he could make a better half-pipe than Murphy's Stingray.  (Thatcher Testimony at 170–71.)  Wave Loch ultimately did not develop this ride because it could not find a buyer for the ride.  (Lochtefeld Testimony at 528; Myrman Testimony at 110.)  Wave Loch's business model was to find a buyer for its proposed ride before building the product.  (Lochtefeld Testimony at 528; Myrman Testimony at 99.)

**C.    Richard Alleshouse and Yong Yeh Start a Business**

While employed at Wave Loch, Mr. Alleshouse began corresponding with his college friend, Mr. Yeh, about forming their own business, now known as Pacific Surf Designs or PSD.  (Alleshouse Testimony at 198–99; Yeh Testimony at 338.)  Mr. Yeh[3] is currently the Chief Executive Officer of PSD, and Mr. Alleshouse is its Chief Operating Officer.  (Yeh Testimony at 322–23.)

On July 9, 2012, while Mr. Alleshouse was still employed at Wave Loch, Mr. Alleshouse and Mr. Yeh exchanged emails about seeking legal advice regarding Mr. Alleshouse's Agreement with Wave Loch.  (Pl.'s Ex. 30.)  A few days later, the two exchanged correspondence about forming their own business.  (Alleshouse

---

[2] Mr. Thatcher was a sales and marketing representative at Wave Loch during Mr. Alleshouse's employ.  (Thatcher Testimony at 154–56.)  He is currently the vice president of business development for Flowrider.  (*Id.*)

[3] Mr. Yeh has been a licensed attorney for over ten years.  (Yeh Testimony at 323.)

Testimony at 198–99; Yeh Testimony at 338.)  About two weeks after, on July 27, 2012, Mr. Alleshouse submitted his letter of resignation to Wave Loch, to be effective on August 3, 2012.  (Pl.'s Ex. 28; Alleshouse Testimony at 200.)

By the time Mr. Alleshouse resigned from Wave Loch, he "had a concept to form a company doing wave machines."  (Alleshouse Testimony at 203.)  On July 30, 2012, prior to his departure, Mr. Alleshouse exchanged emails with Mr. Yeh about ways to generate "pre-event buzz" for an upcoming event hosted by the International Association of Amusement Parks and Attractions ("IAAPA").  (*Id.*; Pl.'s Ex. 27.)  The day after he left Wave Loch's employment, Mr. Alleshouse sent an e-mail to Mr. Yeh that he had "gained the ability to start a company on a niche market ;)."  (Pl.'s Ex. 29.)  On the same day, Mr. Alleshouse started documenting designs for wave rides in a notebook.  (Pl.'s Ex. 21; Alleshouse Testimony at 220–22.)  By August 8, 2012, Mr. Yeh had prepared the IAAPA booth registration forms and submitted incorporation documents for PSD.  (Pl.'s Ex. 23; Alleshouse Testimony at 223–25; Yeh Testimony at 345–46.)

On August 14, 2012, Mr. Alleshouse diagrammed nozzle structures that would "vary flow direction and thickness to optimize surfing experience on the waves and mxmz economics of the attraction."  (Pl.'s Ex. 36.)  Two days later, Mr. Alleshouse diagramed a half-pipe ride with multiple angled nozzles to project water across the surface with the notations, "3 nozzles, all pointing slightly away from each other.  Nozzle #2 can be shut off to run 2 separate rides."  (Pl.'s Ex. 22; Alleshouse Testimony at 237–40.)

By August 20, 2012, Mr. Alleshouse and Mr. Yeh had a "general idea of the three product categories [they] were going to launch."  (Alleshouse Testimony at 251.)  On August 20, 2012, Mr. Alleshouse sent Mr. Yeh an email outlining their three product categories.  (Pl.'s Ex 19; Alleshouse Testimony at 246–51.)  "Group 1" was the "FlowRider knock offs" referred to as Waikiki and Makaha.  (Pl.'s Ex 19.)  "Group 2" was the "halfpipe type wave" that is "basically [M]urphy[']s wave

halfpipe but with water on the sides," and "would be protected by our patents." (*Id.*) Group 2 also included a ride "very similar to the WaveOz." (*Id.*) "Group 3" was the "[B]arreling wave, which W[ave] L[och] calls … F[low]B[arrel] 5 and F[low]B[arrel] 10." (*Id.*)

On September 5 and 6 of 2012, Mr. Yeh, residing in the Bay Area, visited Mr. Alleshouse in San Diego to help build these models for the IAAPA Conference. (Pl.'s Ex. 16; Alleshouse Testimony at 257–58, 312, 348; Yeh Testimony at 678.) The completed models focused on "Group 2" and were displayed at the IAAPA conference in November 2012, and eventually developed as attractions for sale by PSD. (Alleshouse Testimony at 256–61.)

In October 2012, Mr. Yeh, with the assistance of a patent agent, filed two provisional patent applications based on the inventions. (Pl.'s Ex. 16; Yeh Testimony at 323–24, 332.) These applications resulted in issuance of three patents by the United States Patent and Trademark Office ("PTO"): Patent Nos. 9,044,685 ("'685 Patent") and 9,302,189 ("'189 Patent"), referred to as the "Ride Patents"; and Patent No. 9,592,433 ("'433 Patent"), referred to as the "Nozzle Patent." (Pl.'s Exs. 11, 13, 14; Alleshouse Testimony at 241–43.) Mr. Alleshouse and Mr. Yeh are named inventors on all three patents, and they assigned the patents to PSD. (Pl.'s Exs. 11, 13, 14.)

## II.

## FINDINGS OF LAW

Plaintiff alleges the following claims: (1) breach of contract against Mr. Alleshouse, (2) intentional interference with contract against Mr. Yeh and PSD, (3) violation of California Business and Professions Code section 17200 against PSD, (4) correction of inventorship for the '685, '189, and '433 Patents, and (5) declaratory relief.

As a threshold matter, Defendants challenge Plaintiff's standing to assert all claims except for declaratory relief. They argue Mr. Alleshouse signed the

– 8 –

Agreement while employed by Wave Loch, Inc. and that the Agreement was never properly assigned to Plaintiff. Defendants' standing argument is addressed first, followed by a discussion of each of Plaintiff's claims for relief.

**A.     Standing**

Whitewater has standing to enforce the Agreement and bring the other claims alleged in this action because it is a successor in interest to Wave Loch, Inc. and owns all of Wave Loch, Inc.'s sheet wave assets, including the subject employment contract. In short, Wave Loch, Inc. was reorganized into Wave Loch LLC, which later transferred its rights and interests in the sheet wave business to Flowrider, which then amalgamated into Whitewater.

Four months after Mr. Alleshouse entered into the Agreement with Wave Loch, Inc., Mr. Lochtefeld formed Wave Loch LLC for tax and related purposes. All of Wave Loch, Inc.'s assets, including its employment contracts, were transferred to Wave Loch LLC pursuant to the organizational document. That document provided for the transfer of the entire "enterprise value" of Wave Loch, Inc. to Wave Loch LLC. As Mr. Lochtefeld testified, Wave Loch LLC needed the employment contracts to operate, "so everything went over." (Lochtefeld Testimony at 517.) The Court agrees.

Thereafter, Mr. Alleshouse's Agreement was transferred to Flowrider when Wave Loch LLC transferred all its rights and interests in the sheet wave business to Flowrider pursuant to the contribution agreement. The contribution agreement provided for the transfer of "agreements" related to Wave Loch LLC's sheet wave business, and the parties intended the transfer to include the employment contracts.

Wave Loch, Inc. and Flowrider later entered into an agreement specifically assigning the Wave Loch, Inc./Alleshouse Agreement to Flowrider. Defendants argue this subsequent agreement is proof that Mr. Alleshouse's Agreement continued to reside with Wave Loch, Inc. and was not transferred to Wave Loch LLC. But Mr. Lochtefeld testified the agreement with Flowrider was simply a

safeguard to ensure that Mr. Alleshouse's Agreement was transferred to Flowrider. (*See* Lochtefeld Testimony at 523–24.)  The Court credits that testimony.

How Flowrider ultimately received enforceable rights under the Agreement is not determinative of the claims at issue.  What matters is whether the Agreement was transferred to Flowrider—and it is clear it was, either by Wave Loch LLC's contribution agreement or by Wave Loch, Inc.'s assignment.

Finally, Mr. Alleshouse's Agreement was transferred to Whitewater by operation of law when Flowrider amalgamated into Whitewater pursuant to Canadian law.  *See FlowRider Surf, Ltd. v. Pacific Surf Designs, Inc.*, 2017 WL 2349031, at *4 (S.D. Cal. 2017) ("By operation of Canadian law, on the date of the amalgamation, all of FlowRider Ltd.'s assets became the property of Whitewater West.")  Accordingly, Whitewater is a successor of Wave Loch, Inc. and properly holds the Agreement.  It has standing to enforce the Agreement and bring the claims asserted in this action.

**B.   Breach of Contract**

"To prevail on a cause of action for breach of contract, the plaintiff must prove (1) the contract, (2) the plaintiff's performance of the contract or excuse for nonperformance, (3) the defendant's breach, and (4) the resulting damage to the plaintiff." *Richman v. Hartley*, 224 Cal. App. 4th 1182, 1186 (2014).  Defendants challenge the validity of the Agreement and dispute Mr. Alleshouse breached the contract.

**1.   Validity of Contract**

There is no dispute that the Agreement was signed by Mr. Alleshouse and that it includes an assignment provision.  Rather, Defendants challenge the validity of the Agreement on grounds that (1) the Agreement lacks definiteness; (2) the Agreement is procedurally and substantively unconscionable; (3) the assignment provision exceeds the scope of California Labor Code section 2870; and (4) the

Agreement violates California Business and Professions Code section 16600.  These arguments are addressed in turn.

### a.   Definiteness

Defendants challenge the formation of the Agreement on grounds that the definition of "Company," which includes Wave Loch, Inc.'s "divisions, affiliates, subsidiaries, associate companies, shareholders, members, employees, licensees, joint venture partners, or any successors thereof," is too indefinite.   "Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006) (citations omitted).  On the other hand, if a contract "is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Id.*

The definition of "Company" is sufficiently certain and did not present any uncertainty between the parties regarding the employment relationship.  As the Court noted in a prior order, the "successor" language at issue is "routinely included in these types of contracts and necessary to protect the proprietary interests of businesses in the relatively common event of organizational restructuring."  (Order Denying Defs.' Mot. for Summ. J. at 7.)  The succession from Wave Loch, Inc. to the LLC was purely a legal event, simply changing the entity from a corporation to a limited liability company to enjoy flexibility in tax reporting options and management structure.  Changing the legal status of the entity had no impact on the daily functioning and duties of Wave Loch employees.   There was no misapprehension as to the "company" Mr. Alleshouse worked for or his duties and obligations.   The contract is sufficiently definite for the Court to "ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Bustamante,* 141 Cal. App. 4th at 209.  Therefore, the Court finds no issue of contract formation on this basis.

### b.      Procedural and Substantive Unconscionability

Defendants argue the Agreement is procedurally and substantively unconscionable.  Under California law, a contract is unenforceable if it is both procedurally and substantively unconscionable.  *Armendariz v. Foundation Health Psychcare Services, Inc.*, 6 P.3d 669, 690 (2000).  The former focuses on "oppression or surprise due to unequal bargaining power," while the latter on terms "so one-sided as to shock the conscience."  *Pinnacle Museum Tower Assn. v. Pinnacle Market Development, LLC*, 282 P.3d 1217, 1232 (2012) (citations and internal quotations omitted).

There was no evidence that Mr. Alleshouse was deprived of an opportunity to read the Agreement before signing it.  Rather, Mr. Alleshouse testified he chose not to read the Agreement because he "was young" and "[did not] know they [were] going to be important[.]"  (Alleshouse Testimony at 195–97, 319.)  But the failure to read an agreement before signing it does not excuse performance.  *See Norcia v. Samsung Telecommunications America, LLC,* 845 F.3d 1279, 1284 (9th Cir. 2017) ("A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing.") (quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001)).

While there was no evidence Mr. Alleshouse was required to sign the Agreement as a condition of employment, it is undisputed the Agreement was presented to him several months after beginning his employment with Wave Loch. This fact shows some level of procedural unconscionability but does not itself render the Agreement procedurally unconscionable, particularly since the assignment provision related directly to the services Mr. Alleshouse was providing and for which he was being compensated.  Accordingly, there was no oppression or surprise of legal significance.

California Labor Code section 2872 requires an employer to provide written notice to its employee that an assignment of invention provision may not include an

invention that the employee develops entirely on his own time without using company equipment or facilities.[4]  It is undisputed Wave Loch did not provide the required notice to Mr. Alleshouse.   California law, however, is silent on the consequences of an employer's failure to provide such notice.  Certainly, that failure should be considered in analyzing procedural unconscionability, but it is not determinative here because the subject matter of the patents in suit was integral to Mr. Alleshouse's work at Wave Loch and would not have been subject to the notice requirements of Section 2872.  No oppression or surprise resulted from the failure to give notice.

Further, the terms of the Agreement are not substantively unconscionable as Mr. Alleshouse was "adequately compensated" for his "inventive duties," including "research[ing]," "design[ing]," "improving existing rides, [and] "developing new rides" for Wave Loch.  (Pl.'s Ex. 2); *see Cubic Corp. v. Marty*, 185 Cal. App. 3d 438, 450 (1986) (though the assignment agreement was offered as a "take-it-or-leave-it" condition of employment, it was not unconscionable because employee's responsibilities "encompassed inventive duties" and employee was "adequately compensated through the terms of employment").  The terms of the assignment also are not "unfair" and do not "shock the conscience" because they do not run afoul of Labor Code section 2870, as discussed below.  Accordingly, the Agreement is not invalid on this ground as it is neither procedurally nor substantively unconscionable.

### c.    California Labor Code Section 2870

Defendants argue the assignment provision is invalid because it exceeds the scope of California Labor Code section 2870 and violates California's restrictions

---

[4] California Labor Code section 2872 provides: "If an employment agreement entered into after January 1, 1980, contains a provision requiring the employee to assign or offer to assign any of his or her rights in any invention to his or her employer, the employer must also, at the time the agreement is made, provide a written notification to the employee that the agreement does not apply to an invention which qualifies fully under the provisions of Section 2870."  Cal. Lab. Code § 2872.

on an employer's ability to monopolize an employee's ideas and inventions, as follows:

> Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:
>
> (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or
>
> (2) Result from any work performed by the employee for the employer.

Cal. Lab. Code § 2870.

First, Defendants contend the assignment provision's "suggested by" language exceeds the scope of Section 2870. However, they fail to explain how requiring an employee to assign inventions "suggested by" his work for the employer exceeds the scope of Section 2870, which permits an employer to require an employee to assign inventions "[r]elate[d] to" the employer's business. *See Cadence Design Systems, Inc. v. Bhandari*, No. 07-823, 2007 WL 3343085, at *5 (N.D. Cal. Nov. 8, 2007) ("Courts interpreting employee assignment agreements in the context of section 2870 have construed the 'related to' phrase broadly.")

Second, Defendants argue the Agreement's definition of "Company," which includes Wave Loch, Inc.'s "successors," exceeds the scope of Section 2870's definition of "employer." Defendants fail to present any authority that defining "Company" in this way presents an overbreadth problem or is otherwise violative of Section 2870. Rather, case law supports a contrary finding. *See id.* at *7 ("[T]he language of [Section 2870] contains[s] a broad phrase permitting assignments of inventions that 'relate to the business of the employer.' Had the California Legislature intended the statute to be restricted to the smallest business division in

which the employee actually works, they would have used such language in the statute itself.")

Third, Defendants claim the assignment provision is overbroad because it does not limit the assignment to inventions conceived *during* the time of employment. However, neither the plain language of Section 2870 nor any case applying its provisions imposes such a restriction. The statute itself only carves out inventions developed "entirely on [an employee's] own time without using the employer's equipment, supplies, [or] facilities[.]" (*Id.*) The statute does not limit the assignment of inventions to matters conceived during employment, but rather directs that such assignments may include matters that "[r]elate at the time of conception … to the employer's business, or … anticipated research or development … ; or [r]esult from any work performed by the employee for the employer." (*Id.*) Thus, the statute permits the assignment of inventions conceived after employment, so long as the inventive idea relates to the employer's business or anticipated research or development or results from work performed by the employee for the employer.[5] Accordingly, the assignment provision is consistent with Labor Code section 2870 and is not invalid under any of the grounds asserted by Defendants.

### d.    California Business and Professions Code Section 16600

Defendants argue the Agreement is prohibited by California Business and Professions Code section 16600. Pursuant to Section 16600, "those contracts that

---

[5] For sound reasons, it appears Section 2870 does not set temporal limitations on an assignment of invention provision because proving when the inventor-employee conceived the invention—the "ah ha" or "light bulb" moment—would be difficult, if not impossible, for the employer to do. Thus, Section 2870 tethers the propriety of such assignment provisions to objective standards, *i.e.*, inventions that relate to the employer's business or anticipated research and development or result from work performed by the employee for the employer, and not to subjective standards such as the moment of conception. The neighboring provisions of the statute are also consistent with this interpretation. For example, California Labor Code section 2872, requires the *employee* to prove his or her inventions are *not* covered by an otherwise valid and enforceable assignment of invention provision.

prevent 'engaging in a lawful profession, trade or business of any kind' are void." *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 583 F.3d 832, 845 (Fed. Cir. 2009).

While the Agreement contains a covenant not to compete that precludes Mr. Alleshouse from using any "confidential information" to "carry on, be engaged by, or take part in any commercial or business endeavor[,]" (Ex. 6, ¶ 3), Plaintiff is not pursuing relief under that provision.[6]  Moreover, the Agreement does not restrain Mr. Alleshouse from engaging in the sheet wave profession.  It only requires him to assign inventions resulting from his work at Wave Loch or relating to Wave Loch's business at the time he was there.  *See Board of Trustees of Leland Stanford Junior University*, 583 F.3d at 845 (stating assignment of researcher's "right, title, and interest in each of the ideas, inventions and improvements" that he might devise "as a consequence of" his work at the company was not void under Section 16600 because he was not restrained from "engaging in any profession").  Accordingly, the Agreement does not violate Section 16600.

### 2.    Breach of Contract

Because the Agreement is valid and enforceable, Mr. Alleshouse bears the burden of demonstrating that the inventions at issue are not covered by the assignment provision.  *See* Cal. Lab. Code § 2872 ("In any suit or action arising [under Section 2870], the burden of proof shall be on the employee claiming the benefits of its provisions.")  The inventions at issue are: (1) a half-pipe/quarter-pipe

---

[6] Even if the noncompete provision were unenforceable, it would not invalidate the assignment provision.  The Agreement contains a severability clause, which provides: "If any provision of this Agreement shall be invalid or prohibited by a court of competent jurisdiction, such provision shall be ineffective to the extent of such prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement."  (Pl.'s Ex. 6, ¶ 10.f.)  *See* Cal. Civ. Code § 1599 ("Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest.")

sheet wave attraction, which resulted in the '685 and '189 Ride Patents, and (2) a nozzle structure that allows adjustable, non-planar flow on sheet rides, which resulted in the '433 Nozzle Patent.

The evidence presented at trial supports a finding that Mr. Alleshouse's conception of the half-pipe/quarter-pipe ride was (a) related to Wave Loch's business and research, and (b) resulted from work performed by Mr. Alleshouse for Wave Loch. Wave Loch held meetings to improve upon Murphy's half-pipe ride by making the sidewalls rideable, and Mr. Alleshouse participated in those meetings. During one of those meetings, Mr. Alleshouse claimed he could make a better half-pipe than Murphy's Stingray. Mr. Alleshouse does not dispute that evidence; he only testified he could not "specifically recall [saying] that." (Alleshouse Testimony at 183.)

In addition, the day after Mr. Alleshouse resigned from Wave Loch, he drew sketches of half-pipes and quarter-pipes in his notebook. Within two weeks of his resignation, Mr. Alleshouse had complete diagrams of the half-pipe/quarter-pipe ride, which he described as a "halfpipe type wave" that is "basically [M]urphy[']s wave halfpipe but with water on the sides[.]" (Pl.'s Exs. 19, 22; Alleshouse Testimony at 237–51.) These ideas resulted in the '685 and '189 Ride Patents, filed three months after Mr. Alleshouse separated from Wave Loch. This evidence shows Mr. Alleshouse's half-pipe/quarter-pipe invention was related to, and emanated from, Wave Loch's business and research.

The evidence also supports a finding that Mr. Alleshouse's conception of the patented nozzle structure was related to Wave Loch's business and founded upon its existing nozzles. Mr. Alleshouse was the product manager for the Flowrider attraction at Wave Loch. One of the features of the Flowrider was the adjustable nozzle structure that varied the thickness of water flow. Additionally, Wave Loch was in the process of developing radial, non-planar nozzles for its WaveOz attraction during Mr. Alleshouse's employ and at a time when he was responsible for

documenting and finalizing the design drawings for that ride.  He attended meetings regarding the WaveOz nozzle structure and had access to Mr. Vicente's models and drawings of the structure, which were stored in their shared office and company server.  Within two weeks of resigning from Wave Loch, Mr. Alleshouse had complete diagrams of similar nozzle structures that would "vary flow direction and thickness to optimize surfing experience on the waves and [maximize] economics of the attraction." (Pl.'s Ex. 36.)  This invention ultimately resulted in the '433 Nozzle Patent, which, like the Ride Patents, was filed only three months after Mr. Alleshouse left Wave Loch.

Common sense shows that the inventions at issue resulted from Mr. Alleshouse's work at Wave Loch.  After all, Mr. Alleshouse (1) suggested that through his experiences at Wave Loch he "gained the ability to start a company on a niche market," (Pl.'s Ex. 29), (2) had plans to start his own company while employed by Wave Loch, (3) had plans to present his own inventions at the IAAPA conference while employed by Wave Loch,  (4) described his ideas for the inventions as "knock offs" of Wave Loch's products,  (Pl.'s Ex. 19), and (5) diagrammed these complex inventions within two weeks of his resignation.

The evidence demonstrates the inventions are covered by the assignment provision.  Mr. Alleshouse has failed to show otherwise.  Because Mr. Alleshouse failed to comply with his contractual obligations, Plaintiff has established breach of the parties' Agreement.

### a.  Equitable Estoppel

Defendants assert the defense of equitable estoppel.  Under California law, the elements of equitable estoppel are: "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." *City of Long Beach v. Mansell*, 476 P.2d 423, 442 (1970).

Plaintiff initially pursued its breach of contract claim in May 2014 in an earlier filed action.  After the parties were unable to resolve their differences, the case was dismissed without prejudice pursuant to a tolling agreement.  More than two years after dismissing that action, Plaintiff filed the present lawsuit.  Defendants contend Plaintiff's dismissal of the 2014 action led them to believe Plaintiff had abandoned its contract claims.

Any reliance by Defendants was not justified because they knew dismissal of the 2014 action was without prejudice and subject to a tolling agreement, and thus could be revived at any time.  Contrary to Defendants' assertion, there is no basis to conclude Plaintiff was required to notify Defendants of its intent to re-file the claim.  Accordingly, Plaintiff is not equitably estopped from asserting these claims.

### b.  Laches

Defendants also assert the defense of laches.  This argument is based on a conclusory allegation that Plaintiff engaged in inexcusable delay and PSD was thereby prejudiced by continuing to prosecute the patents.  Defendants have failed to establish unreasonable delay and prejudice, both of which are necessary to a defense on this ground.  *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951 (9th Cir. 2001) ("To demonstrate laches, the defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself.") (citations and internal quotations omitted).  Having failed to meet these elements, this defense lacks merit.

### C.  Intentional Interference of Contract

Plaintiff failed to prove that Mr. Yeh and PSD intentionally interfered with the Wave Loch/Alleshouse Agreement.  "Under California law, a claim for intentional interference with contract requires: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce breach or disruption of the contract; (4) actual breach or disruption; and (5) resulting damage." *Family Home and Finance Center,*

*Inc. v. Federal Home Loan Mortg. Corp.*, 525 F.3d 822, 825 (9th Cir. 2008) (citations omitted).

At issue is the third element—whether Mr. Yeh and PSD intended to induce breach or disrupt Mr. Alleshouse's Agreement with Wave Loch, Inc. and its successors. *See Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 911 (9th Cir. 2008) ("Generally, the knowledge of a corporate officer within the scope of his employment is the knowledge of the corporation.") (citations omitted). Plaintiff contends that Mr. Yeh and PSD disrupted Mr. Alleshouse's Agreement by having Mr. Alleshouse assign the inventions to PSD, instead of to Wave Loch or its successors. As evidence of Mr. Yeh's intent, Plaintiff points to the fact that he sought advice of counsel regarding Mr. Alleshouse's Agreement. (*See* Pl.'s Ex. 30.) But that evidence also supports the opposite inference—that Mr. Yeh sought legal advice to ensure the assignments would be lawful and not interfere with Mr. Alleshouse's Agreement. There is insufficient evidence to conclude Mr. Yeh and PSD intended to disrupt Mr. Alleshouse's contractual obligations to Plaintiff. Accordingly, Plaintiff's intentional interference claim lacks merit.

**D.    California Business and Profession Code Section 17200**

Plaintiff failed to show PSD engaged in "unlawful" or "unfair" business practices. California's Unfair Competition statute "prohibits any unfair competition, which means 'any unlawful, unfair or fraudulent business act or practice.'" *In re Pomona Valley Med. Group*, 476 F.3d 665, 674 (9th Cir. 2007) (quoting Cal. Bus. & Prof. Code § 17200, et seq.). This law is "intended to preserve fair competition and protect consumers from market distortions." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 891 (2011).

Plaintiff's assertion that PSD engaged in "unlawful" business practice is based on its intentional interference claim, which fails for the reasons discussed above. Alternatively, Plaintiff claims PSD engaged in "unfair" business practice by advertising and offering inventions that should have been assigned to Whitewater.

However, other than this conclusory allegation, Plaintiff fails to show how such conduct is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" as to constitute "unfair" conduct under Section 17200. *See Ticconi v. Blue Shield of Calif. Life & Health Ins*. Co., 160 Cal. App. 4th 528, 539 (2008) ("An unfair business practice occurs when that practice … is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.") (citations and internal quotations omitted). Because the facts do not support a finding of "unlawful" or "unfair" business practices, Plaintiff's Section 17200 claim is denied.

**E.     Correction of Inventorship**

Plaintiff alleges Mr. Yeh was improperly joined as co-inventor of the '685, '189 and '433 Patents. Section 256(a) of Title 35 of the United States Code permits correction of inventorship "[w]henever through error a person is named in an issued patent as the inventor." 35 U.S.C. § 256(a). "The inventors as named in an issued patent are presumed to be correct." *Hess v. Advanced Cardiovascular Sys., Inc*., 106 F.3d 976, 980 (Fed. Cir. 1997) (citations omitted). In cases alleging misjoinder, as here, "the burden on each party [is] to show facts supported by clear and convincing evidence that the [ ] person listed as an inventor had not in fact contributed to the conception of the invention." *Thompson v. Haynes*, 305 F.3d 1369, 1384 (Fed. Cir. 2002). In other words, the party alleging misjoinder must show by clear and convincing evidence "that the persons to be removed did not contribute to the invention of any of the allowed claims." *Univ. of Pitt. of Commonwealth Sys. of Higher Ed. v. Hedrick*, 573 F.3d 1290, 1297 (Fed. Cir. 2009).

The evidence supports a finding that Mr. Alleshouse alone conceived of the inventions, and that Mr. Yeh's contributions occurred thereafter and are insufficient under the law. Mr. Alleshouse's notebook shows that by August 16, 2012, he had conceived of the half-pipe/quarter-pipe designs and adjustable nozzles—which ultimately resulted in the '685, '189, and '433 Patents. *Eli Lilly and Co. v. Aradigm Corp*., 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("Conception is … the completion of

the mental part of invention.") (citing *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227–28 (Fed. Cir. 1994)).  Based on these designs, Mr. Alleshouse knew what types of products he would build and sell for the targeted niche market, and he shared those ideas with Mr. Yeh on August 20, 2012.  After conception, Mr. Yeh helped reduce the inventions to practice by testing out the models in Mr. Alleshouse's garage in September 2012.  Mr. Yeh also helped identify practical issues with the models based on his experiences in surfing and skateboarding.  *See Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("[O]ne does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention."); *Garrett Corp. v. U.S.*, 422 F.2d 874, 881 (Ct. Cl. 1970) ("One who merely suggests an idea of a result to be accomplished, rather than means of accomplishing it, is not a joint inventor.") (citations omitted).

Moreover, Plaintiff produced evidence that Mr. Yeh's alleged patentable contributions were either rejected by the patent office or mirrored pre-existing technology by Wave Loch.  For example, all of Mr. Yeh's contributions to the '685 and '189 Ride Patents—safety chute, rideable sidewall of a complex curve shape, and plurality of elevated water recovery sections—were found to be unpatentable by the PTO in light of the Lochtefeld prior art.  (Pl.'s Ex. 132; Dr. Stevich Testimony at 408–19.)  Similarly, Mr. Yeh's purported contributions to the '433 Nozzle Patent of a nonplanar orifice with varying thickness and variable flow angles were found to be unpatentable in light of the Lochtefeld prior art.  (Pl.'s Ex. 134; Dr. Stevich Testimony at 420–23; Lochtefeld Testimony at 531–36; Pl.'s Closing Argument at 789–94.)  Likewise, Mr. Yeh's alleged patentable contribution regarding water flow adjustment in the Z-Y plane reflected existing technology in Wave Loch's Flowrider rides.  (Pl.'s Ex. 134; Stevich Testimony at 420–23; Lochtefeld Testimony at 531–36); *see Eli Lilly and Co. v. Aradigm Corp.*, 376 F.3d 1352, 1359 (Fed. Cir. 2004) ("Contributions to realizing an invention may not amount to a contribution to conception if they merely explain what was 'then state of the art.'")

This evidence demonstrates Mr. Yeh did not contribute to the conception of the inventions as required by law. Plaintiff has met its burden. Accordingly, Mr. Yeh was improperly named as a co-inventor for the patents in suit.

**F.     Declaratory Relief**

Based on the foregoing findings that Plaintiff has proved its claims for breach of contract and correction of inventorship, the Court grants Plaintiff's request for declaratory relief and orders that: (1) the records of the PTO be corrected to remove Mr. Yeh as an inventor for the '685, '189, and '433 Patents, and (2) the patents in suit be reassigned from PSD to Plaintiff.

**G.     Damages**

Plaintiff seeks $1.8 million in reasonable royalty damages based on a hypothetical negotiation for a license fee paid by PSD to Whitewater to use the patented technology. (Testimony of Dr. Robert Vigil Testimony at 610–12; 642–44.) This hypothetical negotiation assumes PSD would have sought a license, and Whitewater would have granted such a license. In reality, Whitewater rarely licenses intellectual property. (Alleshouse Testimony at 302–04; Chutter Testimony at 61.)

This case is therefore better suited to a damages calculation based on traditional concepts of compensatory damages and unjust enrichment. (Testimony of Dr. Justin Lewis ("Dr. Lewis Testimony") at 749–51.) The goal of compensatory damages is to put the plaintiff "in as good a position as he or she would have occupied" if the defendant had not breached the contract. *Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.*, 34 Cal. 4th 960, 967 (2004).

Here, no evidence was presented of Whitewater's loss from not having ownership of the patents. In fact, PSD was unable to find a single buyer for its patented rides. (Yeh Testimony at 352.) Wave Loch was also unable to find a buyer for a similar half-pipe ride. (Lochtefeld Testimony at 528; Myrman Testimony at 110.) And Plaintiff did not present any evidence that it could have found a buyer had it owned the patents. (*See* Yeh Testimony at 352; Lochtefeld Testimony at 528.)

In addition, no evidence was adduced showing Defendants were unjustly enriched. Indeed, the evidence showed Defendants were unable to make a single sale of the patented inventions. (Dr. Lewis Testimony at 761–62.) Because Plaintiff has failed to establish damages on these grounds or entitlement to a reasonable royalty, the Court declines to award monetary damages.[7]

## III.

## CONCLUSION AND ORDER

Based on the foregoing findings of fact and conclusions of law, it is ordered as follows:

1. Defendant Yong Yeh is to be removed as co-inventor of the '685, '189, and '433 Patents;

2. The '685, '189, and '433 Patents are to be reassigned from PSD to Plaintiff; and

3. Plaintiff may file a separate motion for attorneys' fees and costs pursuant to Federal Rule of Civil Procedure 54(d).

**IT IS SO ORDERED.**

Dated:  March 27, 2019

Hon. Dana M. Sabraw
United States District Judge

---

[7]  Plaintiff may be entitled to reasonable attorneys' fees and costs pursuant to the parties' contract.  (*See* Pl.'s Ex. 6 at 3.)  The Court reserves ruling on this issue pending further briefing, including whether apportionment of fees is warranted.